HAMMONS v CITY OF HIGHLAND PARK POLICE DEPARTMENT

Docket No. 67981. Argued May 3, 1983 (Calendar No. 5).—Decided December 28, 1984. Released January 29, 1985. Rehearing denied *post,* 1202.

Pamela Hammons sought workers' compensation benefits for herself and her minor children following the death of Arlie C. Hammons, her former husband, by suicide. At the time of his death, Arlie C. Hammons worked as a police officer for the City of Highland Park Police Department. The Workers' Compensation Appeal Board denied Mrs. Hammons benefits because she was not married to or living with Mr. Hammons at the time of his death, but awarded death benefits to the children. The Court of Appeals, D. F. Walsh, P.J., and D. E. Holbrook, Jr., and MacKenzie, JJ., denied leave to appeal (Docket No. 57961). The city appeals, contending that the board applied the wrong test in determining that the decedent's death by suicide was the result of a personal injury arising out of and in the course of his employment.

In an opinion by Justice Levin, joined by Chief Justice Williams and Justices Kavanagh and Cavanagh, the Supreme Court *held:*

A death by suicide is compensable under the workers' compensation act as a personal injury arising out of and in the course of employment where there is an adequate causal nexus between the suicide and a work-related injury.

1. Compensation is payable for incapacity to work because of a mental disorder arising out of and in the course of employment regardless of whether the disorder results from a physical injury. The disorder itself may be the personal injury. In this case, the board found that the decedent had suffered a profound emotional disorder which led him to commit suicide and that the disorder was a personal injury arising out of and in the course of his employment.

2. The chain-of-causation test is the proper test. In applying it, the questions of causation or intervening causation and

REFERENCES FOR POINTS IN HEADNOTES

[1-4] 82 Am Jur 2d, Workmen's Compensation §§ 309, 310.
Suicide as compensable under workmen's compensation act. 15 ALR3d 616.

intention should not turn on whether the worker knew what he was doing. A mind disoriented by physical or mental pain may be so impaired in its reasoning capacity that, although aware of the choices, it is incapable of rational choice. The requisite causal connection between a work-related injury and death is not broken by an act that is the product of work-related mental injury and a resulting impaired capacity for rational decision and choice. The impairment of the capacity for rational choice and an act of suicide resulting from that impairment are consequences of the mental injury and not separate or intervening causes. If work results in a mental injury and the mental injury results in suicide, the suicide is compensable. The board found that the decedent's profound emotional disorder led to his suicide and that work-related and non-work-related problems combined to cause his illness and death. Compensation may be awarded where there is a work-related factor. The findings of the board appear to have resulted from a straightforward application of the chain-of-causation test.

Affirmed.

Justice Ryan, joined by Justices Brickley and Boyle, dissenting, stated that the "chain of causation" test adopted by the majority, properly applied, requires the board to make explicit factual findings regarding the causal link between the employment and the injury, and between the injury and the act of suicide. In order to establish this latter nexus, it must be shown that Hammons' mental injury was of such a quality as to have so impaired his reasoning faculties that his act of suicide was not the product of a rational mind. Although, the board's opinion can be read to contain an implicit finding that Hammons suffered a personal injury in the course of his employment, it does not contain any indication that the board examined the relationship between Hammons' injury and his act of suicide. The board's opinion indicates that it merely assumed a causal link between the injury and the act of suicide. Because the WCAB has not made a factual finding regarding whether or not Hammons' injury was of such a quality as to have rendered him incapable of rational choice, the case should be remanded to the board for further fact finding.

OPINION OF THE COURT

1. WORKERS' COMPENSATION — DEATH BENEFITS — SUICIDE.

A death by suicide is compensable under the workers' compensation act as a personal injury arising out of and in the course of employment where there is an adequate causal nexus between the suicide and a work-related injury (MCL 418.301 *et seq.;* MSA 17.237[301] *et seq.*).

2. WORKERS' COMPENSATION — DEATH BENEFITS — SUICIDE.

> Compensation is payable for incapacity to work because of a mental disorder arising out of and in the course of employment regardless of whether the disorder results from a physical injury (MCL 418.301 *et seq.;* MSA 17.237[301] *et seq.).*

3. WORKERS' COMPENSATION — DEATH BENEFITS — SUICIDE.

> The impairment of the capacity for rational choice by a work-related emotional disorder and an act of suicide resulting from the impairment are consequences of the emotional disorder and not separate or intervening causes; the causal connection required under the workers' compensation act between a work-related injury and death is not broken by an act that is the product of the disorder and the impaired capacity (MCL 418.301 *et seq.;* MSA 17.237[301] *et seq.).*

DISSENTING OPINION BY RYAN, J.

4. WORKERS' COMPENSATION — DEATH BENEFITS — SUICIDE.

> *A death by suicide is compensable under the workers' compensation act where an explicit causal link is found between employment and a job-related mental injury and between the injury and the suicide; in order to establish the nexus, it must be shown that the injury was of such a quality as to have so impaired the worker's reasoning that the suicide was not the product of a rational mind.*

*Henry A. Krolik* for the plaintiff.

*Lacey & Jones* (by *Gerald M. Marcinkoski)* for the defendant.

Amicus Curiae:

*Bockoff & Zamler, P.C.* (by *Daryl Royal),* for Michigan Trial Lawyers Association.

LEVIN, J. The question, as stated by defendant-appellant City of Highland Park, is whether "the Workers' Compensation Appeal Board err[ed] as a matter of law by not applying the chain-of-causation test to determine whether or not the deceased's suicide resulted from a personal injury

arising out of and in the course of employment."
We hold that the WCAB did not so err, and affirm.

I

Arlie C. Hammons committed suicide on December 26, 1974. Pamela Hammons, his former wife, filed a claim for death benefits under the workers' compensation act on her own behalf and on behalf of her minor children. A hearing referee denied benefits. The WCAB reversed and awarded benefits "having found that decedent's profound emotional disorder, which led to his suicide, was produced by a combination of non-work-related and work-related factors. *Deziel v Difco Laboratories, Inc (After Remand),* 403 Mich 1 [268 NW2d 1] (1978)."

Hammons, an 18-year veteran of the Highland Park Police Department, had advanced to the rank of corporal and was working as an acting temporary sergeant at the time of his death. The WCAB appears to have adopted the testimony of witnesses who "all agreed that [Hammons] desperately wanted and strove for a promotion to sergeant in 1974." He had taken a promotional examination in 1972 and was at the top of the list. One week before his death, he learned that "his chances for future promotion were considerably reduced."[1] The WCAB said, adopting the testimony of witnesses, that his reaction was to become "very upset" and "very depressed." Detective Grimm

[1] The WCAB said:

"Decedent took a promotional exam in 1972 and was at the top of the list when he was sent to Command Supervisors School in early 1974. It was understood that this training was undergone in anticipation of and preparation for an appointment to the next sergeant vacancy. When the City of Highland Park decided to eliminate several sergeant posts, the Highland Park Police Officers' Association filed suit. One week before his death, decedent learned that that complaint had been dropped and that his chances for future promotion were considerably reduced." *Hammons v Highland Park Police Dep't,* unpublished opinion of the WCAB, filed April 22, 1981.

related a conversation with Hammons on the morning of his death that "revolved around decedent's depression about the dropping of the complaint [to require the city to restore sergeant posts that it had eliminated] and his feeling that he would never get the promotion that he so very greatly wanted. It appeared that decedent had been crying." In addition, Hammons was disturbed about having to return to the ranks after working as acting sergeant. Hammons told his son that "he didn't feel that he would be able to work with his fellow officers again because of the bad feelings" created when he "had to supervise and report on" them. The opinion of the WCAB referred to a note, written by Hammons immediately before his death, that said:

"Where is the End (ask Grimm). The pressure & the agony is just too great to bear. To notify [an aunt, a cousin, and sons and daughters] Love to all. Arlie C. Hammons." "Ace," "I have been very unhappy the last *30* years." (Emphasis in the original.)

The WCAB stated that its review of the record persuaded it that Hammons' "desire for advancement was a major subject of discussion and preoccupation during his final year of life." The WCAB found "that his disappointment in this endeavor, coupled with real and with anticipated problems with co-workers, were major factors in the development of decedent's extreme depression and resultant suicide." The WCAB said that it had rejected testimony of the city's expert witness that Hammons' "emotional state and death were the direct result of his non-work-related problems and not at all contributed to by any difficulties in his employment. We find more reasonable the opinion of [Mrs. Hammons' expert witness] that both work-

related and non-work-related problems combined to produce decedent's illness and death. The existence of those non-work-related difficulties does not negate the compensability of the work-related factors. *Kepsel v McCready & Sons,* 345 Mich 335 [76 NW2d 30] (1956)."[2]

---

[2] The brief of the city recounts the testimony that would support the conclusion that Hammons' depression and mental problems were attributable to factors other than work:

"Mr. Hammons' childhood was plagued with family problems. He was raised without the benefit of a father. His father had died six months before his birth. His mother remarried, but her second marriage ended in divorce. Furthermore, decedent and his mother had a strained, distant relationship.

"Perhaps for these reasons, the decedent was very devoted to and 'caught up' in his own family. He was unhappy with his son John's irresponsibility. He wanted to move his family from Highland Park because he feared his daughters would begin interracial dating, which he abhorred. The Hammons, however, were financially unable to move. In fact, the Hammons were in constant financial difficulty, as the decedent was apt to live beyond his means.

"In 1968, one of decedent's daughters, Pammy, died in a tragic auto accident. She was returning to school at lunchtime when an automobile ran a red light. The car, out of control, drove over the curb, knocked over a safety-boy and crossing-lady, and dragged Pammy across the street. The car eventually pinned the girl against a tree. She lived for 5-1/2 hours, but never regained consciousness. Immediately after the accident, the decedent was deeply disturbed. He had to be helped to his room by his fellow police officers and put to bed. His wife called a doctor who sedated Mr. Hammons by means of an injection.

"Decedent was not able to make arrangements for his daughter's funeral. Mrs. Hammons recalled that Mr. Hammons would lie on the couch with his deceased daughter's paper-mache, angel-doll and with her Girl Scout uniform over his arm. Two or three days before his daughter's death, Pammy had asked the decedent if she could play with his transistor radio, but Mr. Hammons did not permit her to do so. After Pammy's death, Mr. Hammons spoke of his refusal to let her play with the radio a great deal. In fact, he had the radio buried with his child. He also requested that his daughter be buried in her Girl Scout uniform. At the wake, decedent held the angel-doll as if he was transfixed in another place. He continued for some time after the funeral in this manner. He would go for long walks in the rain and disappear for periods of time. He would walk back to the park where he played with his deceased daughter and carry mementos of his daughter with him. Mrs. Hammons requested that the decedent's fellow officers take away decedent's firearms because the decedent was unstable and she did not trust him in the house. The decedent's hunting revolvers and pistols were locked up, pursuant to her instruc-

The WCAB denied Mrs. Hammons benefits, stating that she is precluded from obtaining benefits because she was no longer married to or living with Hammons at the time of his death.[3] Death benefits were awarded to daughters born in 1960 and 1966.[4]

The Court of Appeals denied leave to appeal. This Court granted leave to appeal.[5] The only issue on this appeal is whether benefits were properly awarded to Hammons' daughters.

tions. Decedent's partner at work, John Holloway, thought that Mr. Hammons would 'lose it' at this time. He believed that Mr. Hammons' deep depression would cause him to lose his mental stability and capacity to operate.

"Before his daughter's death, the deceased .was described as an easy-going, happy-go-lucky person. After her death, he nearly had a nervous breakdown and became tense and short-tempered. The decedent had never been under a doctor's care before the incident, but thereafter began treating [sic] for nervous and emotional problems. Mrs. Hammons recalled that Mr. Hammons completely lost interest in living about this time.

"In addition to this calamity, Mr. Hammons' marriage deteriorated. After Pammy's death, Mrs. Hammons had a hysterectomy. Mr. and Mrs. Hammons ceased having sexual relations with one another. By late 1973, it became clear that their personal problems would lead to divorce. The decedent moved into the attic of the marital home. Mrs. Hammons testified that the tension was building in early 1974 to where she was afraid of [sic] her own life. She described the situation as 'like sitting on a powder keg'. At one point, the decedent almost choked his wife to death. The decedent was eventually forced via court order to move from the attic of the marital home. At this time, decedent was losing weight, dyeing his hair, and wearing flashy clothes. The Hammons' ensuing divorce was long and bitter.

"Following his June 21, 1974 divorce, the decedent became romantically involved with a co-employee, Gloria Strongman, at the hospital where he worked. The decedent was very eager to re-marry after his divorce. He purchased an engagement ring for Ms. Strongman at Christmas time, just days before his death. Ms. Strongman rejected his offer of marriage, however, 1-1/2 days before his death. Richard Grimm, a co-employee of decedent, consoled the decedent by saying he and Ms. Strongman should not get married because they were both divorced and had the same problems."

[3] The WCAB cited MCL 418.331(1)(b); MSA 17.237(331)(1)(b) and MCL 418.341; MSA 17.237(341).

[4] Benefits were awarded from the date of death and until the further order of the board, not to exceed 500 weeks. See MCL 418.321; MSA 17.237(321).

[5] 414 Mich 871 (1982).

II

The City of Highland Park contends that this Court should adopt the "chain of causation" test for determining when a worker's death by suicide is the result of "a personal injury arising out of and in the course of employment."[6] This test was favored by Justice SOURIS and two other justices in *Trombley v Coldwater State Home & Training School,* 366 Mich 649, 669; 115 NW2d 561 (1962), where a decision of the WCAB awarding compensation to the widow of a worker who had committed suicide during the course of a legislative investigation of alleged mistreatment of patients at a mental institution where the worker was an attendant nurse was affirmed by an equally divided Court. The other three justices sitting in the case, in an opinion by Justice CARR, said that compensation should be denied because the general rule, as set forth in *Sponatski's Case,* 220 Mass 526; 108 NE 466 (1915), and subsequent decisions, is that workers' compensation benefits are not recoverable because of the suicide of a worker "injured in the course of his employment, such injury arising therefrom, unless as a proven result the suicide has occurred in a moment of insane frenzy or because of irresistible impulse. Deliberate planning of an act of suicide, with mental ability to understand the nature of the act, involves the introduction of an intervening cause in the chain of circumstances to which cause the death must be attributed." *Trombley,* p 660. Justice CARR concluded that Trombley's mental condition was not the result of a physical injury sustained in the course of employment, as the evidence showed planning, not an act committed in an emotional or

[6] MCL 418.301; MSA 17.237(301).

insane frenzy or in obedience to an irresistible or uncontrollable impulse. *Id.,* pp 658, 660, 661.

The city asserts that the WCAB applied still a third test, the "honest, though mistaken, perception" test stated in *Deziel v Difco Laboratories, Inc, supra,*[7] and notes that the Court of Appeals, after decision by the WCAB in the instant case, adopted the *Deziel* test in another case. *Lopucki v Ford Motor Co,* 109 Mich App 231, 235; 311 NW2d 338 (1981).

We agree with the city that the chain-of-causation test is the correct test, but are satisfied that the WCAB applied that test and not the *Deziel* test.

### III

The first inquiry is whether the worker who committed suicide received "a personal injury arising out of and in the course of employment."[8] The second inquiry, the *Sponatski-Trombley* question, is whether there is an adequate causal nexus between the work-related injury and the suicide.

### A

We first consider whether Hammons received "a

---

[7] "We hold, as a matter of law, that in cases involving mental (including psychoneurotic or psychotic) injuries, once a plaintiff is found disabled and a personal injury is established, it is sufficient that a strictly *subjective* causal nexus be utilized by referees and the WCAB to determine compensability. Under a 'strictly *subjective* causal nexus' standard, a claimant is entitled to compensation if it is factually established that claimant *honestly perceives* some personal injury incurred during the ordinary work of his employment 'caused' his disability. This standard applies where the plaintiff alleges a disability resulting from either a physical or mental stimulus and honestly, even though mistakenly, believes that he is disabled due to that work-related injury and therefore cannot resume his normal employment. See Anno: *Workmen's compensation: neurasthenia as compensable,* 44 ALR 500." *Deziel v Difco Laboratories, Inc (After Remand), supra,* p 26.

[8] See fn 1.

personal injury arising out of and in the course of employment." Justice SOURIS observed in *Trombley* that this Court had "held that compensation benefits are payable for incapacity to work because of a claimant's mental disorder arising out of and in the course of his employment, whether or not such mental disorder results from a direct physical blow to claimant's body."[9] That construction of the act is now well established.[10]

The finding of the WCAB that Hammons had suffered a "profound emotional disorder" which led him to commit suicide supports the implicit finding of the WCAB that Hammons received a "personal injury." The further finding that this injury arose out of and in the course of the employment acknowledged that both work-related

---

[9] *Trombley v Coldwater Training School, supra,* pp 662-663, citing *Carter v General Motors Corp,* 361 Mich 577; 106 NW2d 105 (1960).

[10] See *Deziel v Difco Laboratories, Inc (After Remand), supra.* See also 1B Larson, Workmen's Compensation Law, § 42.20 *et seq.*

Professor Larson has written:

"Although it is sometimes said that the suicide must stem from a 'compensable physical injury,' this statement is unduly restrictive. The correct statement is that the suicide must be the result of some injury arising out of and in the course of employment. In other words, it should not be necessary to show that the first injury resulted in the kind of disability that would in itself have technically entitled the claimant to compensation. For example, in *Wilder v Russell Library Company,* [107 Conn 56; 139 A 644; 56 ALR 455 (1927)], a librarian suffered a physical and nervous breakdown due to overwork and worry and committed suicide when her condition developed into insanity. Although there was a history of predisposition to mental trouble in her family, compensation was awarded on the ground that the suicide was the direct result of the employment. Similarly, in *Trombley v State of Michigan,* an employee of the Coldwater State Home and Training School had been questioned by a legislative committee which was investigating the death of a patient at the Home. He heard on the evening news broadcast that the committee was preparing to continue the investigation. Up to that time, the employee 'had felt aggrieved' by the accusations made against him, but merely 'threw up his hands and went to bed' on hearing the latest news. The next day he slipped out of the house, drove a mile to a secluded spot, and shot himself with a rifle. Compensation was affirmed by an equally divided court." Larson, Workmen's Compensation Law, Desk Edition, § 36.40.

and non-work-related[11] factors led to Hammons' emotional disorder. Both *Deziel*[12] and *Kepsel,*[13] relied on by the WCAB, together with other authorities,[14] fully support the conclusion of the WCAB

[11] See fn 2.

[12] "Any objective causation standard, whether it be in the form of the 'but-for' or the 'aggravation-acceleration' rule, will be of little assistance in deciding whether to award compensation in cases involving psychoneuroses or psychoses. Perhaps some direct causal nexus with an employment event can be established in a few cases. But in most cases a constellation of psychodynamic factors is involved; therefore, it is almost impossible to weigh the causal significance of any one factor. Indeed, it has been posited that the utilization of an objective legal causal analysis in these psychoses cases would be analogous to entering a maze without a map. Psychoneuroses and psychoses take on so many shades and forms as to show no logical pattern vis-à-vis any notion of objective legal causation." *Deziel v Difco Laboratories, Inc (After Remand), supra,* p 28.

[13] "The compensation act contemplates no such absurdity. Its requirements are simple: The claimant must show a reasonable relation of cause and effect between work and injury. Other possible or probable causes of the injury do not have to be excluded beyond doubt." *Kepsel v McCready & Sons, supra,* pp 343-344.

[14] "Preexisting disease or infirmity of the employee does not disqualify a claim under the 'arising out of employment' requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought. This is sometimes expressed by saying that the employer takes the employee as he finds him.

"As to 'accelerating' the disease, common examples include various kinds of heart failure due to exertion, excitement, or other employment conditions which precipitate the failure of a heart that is already weak, but which, but for these conditions, might have gone on functioning reasonably well for an indefinite time; the 'lighting up' of tuberculosis because of injury, exposure, and the like, which might have remained latent and inactive but for the employment; and acute appendicitis precipitated by the exertions or impacts of the employment, since the appendix, although diseased, might have remained unruptured for an indeterminate time but for the employment.

" 'Aggravating' the disease is exemplified by cancer cases in which the malignant growth is ruptured or spread by occupational exertions, or in which its development is hastened by strains, impact, inhalations, or accidents in the course of employment. The preexisting condition may be any kind of weakness. It may be a syphilitic condition, as in a case in which injuries from an automobile accident combined with a syphilitic condition to produce insanity. It may be mental or nervous in character, as in the case of a workman who had recovered from a paranoid schizophrenia, but suffered a recurrence as a result of a fall. It may be a back condition, weakened limb, as in the case of a claimant whose arm had previously been broken and had

that "[t]he existence of those non-work-related difficulties does not negate the compensability of the work-related factors." The WCAB's conclusion that Hammons suffered a personal injury in the form of mental illness arising out of and in the course of the employment appears to have been reached by analysis conforming to the applicable rules of law.

## B

We turn to the second inquiry, the adequacy of the causal nexus between the work-related injury and the suicide. In *Sponatski, supra,* the Supreme Judicial Court of Massachusetts affirmed an award of compensation based on a finding by the administrative tribunal that the worker, while insane as a result of his injury and acting from an uncontrollable impulse, threw himself from a window and was fatally injured. Although not necessary to decision, the Court stated in dictum a rule that came to be adopted in a majority of jurisdictions.[15] The Court said that where, as in the case before the Court, "there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy 'without conscious volition to produce death, having knowledge of the physical nature and consequences of the act,' then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a

---

healed poorly, so that it could be injured by a mishap that probably would not have hurt a normal arm." 1 Larson, Workmen's Compensation Law, § 12.20.

[15] See 1A Larson, Workmen's Compensation Law, § 36.00; Anno: *Suicide as Compensable Under Workmen's Compensation Act,* 15 ALR3d 616, 629.

voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicide act even though the choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury." *Sponatski, supra,* p 530.

The *Sponatski* formulation requires a mental illness of such severity as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition.[16] In *Trombley, supra,* Justice Souris and two other justices were of the opinion that although the workers' compensation benefits awarded to Trombley's widow could be affirmed in the application of the *Sponatski* voluntary-wilful choice test or the chain-of-causation test, the *Sponatski* test should be rejected.[17]

[16] See 1A Larson, Workmen's Compensation Law, § 36.30.

[17] "In January of this year Mr. Justice Schaefer, of the Illinois supreme court, had occasion to analyze the *Sponatski* rule in his opinion in *Harper v Industrial Commission,* [24 Ill 2d 103; 180 NE2d 480 (1962)]. His analysis considers the major objections to *Sponatski* expressed by legal scholars and other courts, objections which I believe are valid and require our rejection of its rule:

" 'Although the test formulated in the *Sponatski Case* has been followed in a number of other jurisdictions (see cases collected 143 ALR 1227 and 56 ALR 459), it has certain rather clear deficiencies. It seems to assume that a man's capacity to choose is a constant, unvariable factor, unaffected by whatever stresses may be brought to bear against it, and so it minimizes to the point of exclusion the possibility that capacity to choose may itself be impaired as the result of a compensable injury. If any degree of choice or volition remains, recovery is to be barred "even though choice is dominated and ruled by a disordered mind,"—which by hypothesis means a mind that has become disordered as the result of the injury for which compensation is sought. To us this underlying assumption of the *Sponatski* test is dubious, both from a medical and from a legal point of view. Neither the record before us, the briefs of the parties, nor the opinions that have adopted the *Sponatski* test suggest that its basic assumption rests upon responsible medical opinion. And so far as the law is concerned, it regularly recognizes, in a multitude of situations subsumed under the concept of duress, that freedom of choice may be so

We agree with Justice SOURIS, the city, Professor Larson,[18] and commentators generally,[19] who have urged the adoption of the chain-of-causation test, that the questions of causation or intervening causation and intention should not turn on whether the worker knows what he is doing. A mind disoriented by physical or mental pain may be so impaired in its reasoning capacity that, although aware of the choices, it is incapable of rational choice.[20]

---

impaired by extrinsic pressures, physical and mental, as to deprive conduct of its normal legal significance.

" 'The *Sponatski* test has been vigorously criticized for its failure to recognize the role which pain or despair may play in breaking down a rational mental process. (1 Larson, Workmen's Compensation [1952], § 36.30; Horovitz, Injury and Death under Workmen's Compensation Laws [1944], pp 134-136; 8 UCLA L Rev 673 [1961]; 45 Iowa L Rev 669 [1960]; *cf.* 1 U of Chicago L Rev 105 [1933].) It has been pointed out that the rule that there can be no recovery unless the suicide occurs "through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death," practically excludes from compensation those cases not marked by some violent or eccentric method of self-destruction. (1 Larson, Workmen's Compensation Law [1952], § 36.20.) And it has been stated that it is erroneous as a matter of law to characterize a suicide as an intervening cause when it is attributable to a psychosis that results from a compensable injury. "The slashing of the wrist was an intervening act, but not an intervening cause. An intervening cause is one occurring entirely independent of a prior cause. When a first cause produces a second cause that produces a result, the first cause is the cause of that result." Fowler, J., dissenting in *Barber v Industrial Commission and Burrell Engineering Co,* 241 Wis 462, 467; 6 NW2d 199; 143 ALR 1222 (1942).' " *Trombley v Coldwater State Home & Training School, supra,* pp 669-671.

[18] See fn 16.

[19] See Anno: *Suicide as Compensable Under Workmen's Compensation Act,* 15 ALR3d 616, 622; Note, *Workmen's compensation—Suicide compensable where casual [sic] connection to injury,* 31 U of Cin L R 187 (1962).

[20] In *Trombley, supra,* p 664, Justice SOURIS wrote:

"In those States, like Michigan, which have statutory provisions [CL 1948, § 412.2] barring recovery of compensation if injury or death results from intentional or wilful action by the decedent employee, the decedent's mental derangement need only be found [in states adopting the chain of causation test] to have so impaired his reasoning faculties that his act of suicide was not voluntary in the sense that term is used to describe rational choice of alternatives."

The requisite causal connection between a work-related injury and death is not broken by an act that is the product of work-related mental injury and resulting impaired capacity for rational decision and choice. The impairment in the capacity for rational decision-making and an act of suicide resulting from such impairment are consequences of the mental injury and not separate or intervening causes. If the work results in mental injury and the mental injury results in suicide, the suicide is compensable.

The WCAB found that Hammons' profound emotional disorder "led to his suicide." It spoke of "decedent's extreme depression and resultant suicide." It said that the work-related and non-work-related problems combined to "produce decedent's

---

CL 1948, § 412.2, is now, without change in language, MCL 418.305; MSA 17.237(305), which reads as follows:

"If the employee is injured by reason of his intentional and wilful misconduct, he shall not receive compensation under the provisions of this act."

We agree with Justice SOURIS. The term "misconduct" suggests culpability or wrongdoing. The actions of a person whose mind is impaired by a profound emotional disorder and extreme depression are not the product of a free will, of unfettered choice, and hence are not voluntary or intentional in the sense that the term "intentional and wilful misconduct" is used in the act.

Professor Larson has written:

"The modern rule is that violation of a statute is not wilful misconduct *per se*. There must be the intentional doing of something of a quasi-criminal nature, either with knowledge that it is likely to result in serious injury, or with a wanton disregard of probable consequences.

"A striking illustration of the relation between the statutory offense and the compensation defense is afforded by the decision in *Day v Gold Star Dairy* [307 Mich 383; 12 NW2d 25 (1943)], in which the claimant, having been involved in a collision resulting from his attempt to pass a truck at the crest of a hill on a wet day, was convicted of reckless driving by a jury. Nevertheless, his award of compensation was affirmed under the Michigan statute making wilful and intentional misconduct a defense. The court held that the compensation department was entitled to determine for itself whether the claimant's conduct was merely a high degree of negligence as distinguished from wilful and intentional misconduct." 1A Larson, Workmen's Compensation Law, § 35.30.

illness and death." The findings appear to be straightforward applications of the chain-of-causation test, and, again, were in conformity with the applicable rules of law.

## C

In *Lopucki, supra,* pp 235-236, the Court of Appeals adopted a *Deziel* analysis for suicide cases:

"We require a different approach. Due to the Michigan Supreme Court's decision in *Deziel v Difco Laboratories, Inc,* 403 Mich 1; 268 NW2d 1 (1978), the theory of an intervening intermediate cause of the suicide is not a viable theory in Michigan. Such theory assumes the existence of a rational part of the brain which chooses suicide despite the survival instinct and this rational portion of the brain is the 'actual' cause of the suicide. The *Deziel* decision eliminated the requirement of showing any 'actual' causal nexus between the employment and the injury. It is now sufficient if a strictly subjective causal nexus is supplied. If it is factually established that a claimant honestly, though mistakenly, perceived some personal injury incurred during his employment caused his disability, then he is entitled to compensation."

In neither *Lopucki* nor the instant case was there a finding that the worker's mental illness or suicide was caused by his non-work-related problems although he "honestly believed" that his work-related problems were the cause of his mental illness. Since compensation was neither sought nor awarded on the basis of "honest perception" and the WCAB could not have been guided by *Lopucki,* which was decided after the instant case was decided, we see no reason to remand for further factfinding out of concern that the departures from the chain-of-causation test in *Lopucki* may have occasioned the award in the instant case.

The citation of *Deziel* by the WCAB in the instant case appears, in context, to relate to the portion of *Deziel* recognizing the difficulty in determining "the causal significance of any one factor," and that nevertheless compensation may be awarded if there is a work-related factor.[21]

## IV

In *Selk v Detroit Plastic Products (On Resubmission)*, 419 Mich 32; 348 NW2d 652 (1984), this Court held that the increase in the interest rate effected by 1981 PA 194[22] from 5% to 12% per annum is retroactive to the date each weekly payment of workers' compensation benefits was due if the compensation is paid after January 1, 1982, pursuant to an award of a hearing referee, the WCAB,[23] or a court.[24]

Affirmed, and remanded to the WCAB for the computation of interest.

Williams, C.J., and Kavanagh and Cavanagh, JJ., concurred with Levin, J.

Ryan, J. *(dissenting)*. By Justice Levin's opinion, the majority has adopted the "chain of causation"

[21] See first paragraph of part I for quotation from the WCAB opinion citing *Deziel*, and fn 12 for quotation from *Deziel*. See also fns 13 and 14 and accompanying text.

[22] MCL 418.801; MSA 17.237(801).

[23] The decision of the WCAB in the instant case is dated April 22, 1981. The order provided for the payment of interest at the rate of 5% per annum from the date each payment was due until paid. The Court of Appeals denied leave to appeal on August 31, 1981. This Court granted leave to appeal on August 10, 1982. (See fn 5.)

[24] Justice Kavanagh and I dissented and would have held (i) that weekly payments that were due and payable *before* January 1, 1982, bear interest at 5% until December 31, 1981, and thereafter bear interest at 12% until paid and (ii) that weekly payments that became or become due and payable *on or after* January 1, 1982, bear interest at 12% until paid. *Selk v Detroit Plastic Products (On Resubmission)*, 419 Mich 32, 37; 348 NW2d 652 (1984).

test to determine whether a deceased's suicide was the product of a personal injury arising out of and in the course of his employment. This test is described in *Trombley v Coldwater State Home & Training School,* 366 Mich 649, 664; 115 NW2d 561 (1962), as follows:

"Some few American courts, Florida, California, New York, Mississippi, and recently Illinois, follow a rule which, generally speaking, allows compensation upon a showing of causal connection between the decedent's employment, his injury or mental disorder and his suicide. This approach regards such suicide as a compensable consequence of a work-connected injury or mental disorder, not as an intervening cause of death. It also obviates the necessity for assessing the 'precise quality' . . . of the decedent's mental condition at the moment of suicide to the extent required by *Sponatski* [220 Mass 526; 108 NE 466 (1915)]. In those States, like Michigan, which have statutory provisions barring recovery of compensation if injury or death results from intentional or wilful action by the decedent employee, the decedent's mental derangement need only be found to have *so impaired his reasoning faculties that his act of suicide was not voluntary in the sense that term is used to describe rational choice of alternatives.*" (Emphasis added, citations and footnotes omitted.)

The proper application of this test requires the WCAB to make explicit factual findings regarding the causal link between the employment and the injury, and between the injury and the act of suicide. Compare *Reynolds Metals Co v Industrial Comm,* 119 Ariz 566; 582 P2d 656 (1978). In order to establish this latter nexus, it must be shown that Hammons' mental injury was of such a quality as to have so impaired his reasoning faculties that his act of suicide was not the product of a rational mind. See *Trombley, supra.*

Although, perhaps, the WCAB's opinion can be

read, as the majority has done, as containing an "implicit finding" that Hammons suffered a personal injury in the course of his employment, it *does not* contain any indication that the WCAB examined the relationship between Hammons' injury and his act of suicide. The opinion indicates that the WCAB merely *assumed* a causal link between the injury and the act of suicide. Since the test articulated by the majority did not exist as a part of Michigan workers' compensation law until today, it is not particularly surprising that the WCAB's opinion does not comport with the test which the majority has announced.

Because the WCAB has not made a factual finding regarding whether or not Hammons' injury was of such a quality as to have rendered him incapable of rational choice, we would remand this case to the WCAB in order to permit that body to carry out its fact-finding function.

BRICKLEY and BOYLE, JJ., concurred with RYAN, J.