HAGERMAN v GENCORP AUTOMOTIVE

Docket No. 107059. Argued December 10, 1997 (Calendar No. 8). Decided
    June 16, 1998. Rehearing denied 459 Mich 1203.

  Marian Hagerman, for herself, and on behalf of Keith Hagerman,
      deceased, sought death benefits under MCL 418.375(2); MSA
      17.237(375)(2), alleging that a work-related injury was the proxi-
      mate cause of the decedent's death. A hearing referee awarded ben-
      efits, concluding that the requirements of subsection 375(2) had
      been met by a chain of medical causation that, although unex-
      pected and unusual, was clear and unbroken. The Worker's Com-
      pensation Appellate Commission, reversed, concluding that the
      death was the result of medication designed to control a preexist-
      ing condition, and that an independent cause led to the death. Ini-
      tially, the Court of Appeals, DOCTOROFF, P.J., and SHEPHERD and
      TAYLOR, JJ., reversed in an unpublished peremptory order (Docket
      No. 164880), but on subsequent plenary consideration, the Court,
      SAWYER, P.J., and BANDSTRA and R. B. BURNS, JJ., affirmed in an opin-
      ion per curiam, concluding that the plaintiff had failed to establish
      that the decedent's death was proximately caused by the work-
      related injury. The Supreme Court remanded the case to the Court
      of Appeals for reconsideration in light of Dedes v Asch, 446 Mich 99
      (1994), in which the phrase "the proximate cause" in the govern-
      mental immunity statute was held not to require a plaintiff to estab-
      lish that the defendant's conduct was the sole proximate cause of
      the plaintiff's injuries. 451 Mich 874 (1996). On remand, the Court,
      SAWYER, P.J., and GRIFFIN, J. (BANDSTRA, J., concurring), affirmed in
      an opinion per curiam, without applying Dedes, concluding that the
      work-related injury and the medication were not substantial factors
      in the death, essentially attributing the death to the preexisting
      condition, and that public policy could not support holding the
      defendant to a duty to protect the decedent from the harm suffered
      (Docket No. 194743). The plaintiff appeals.

    In an opinion by Justice BOYLE, joined by Chief Justice MALLETT,
  and Justices CAVANAGH and KELLY, the Supreme Court held:

    The circumstances of the decedent's death were within the range
  of compensable consequences under subsection 375(2). The evi-
  dence was sufficient to support the magistrate's conclusion that the
  injury was the primary moving or substantial cause of the death.

1. There is no basis to conclude that "legally recognized cause" under subsection 375(2) means "sole proximate cause." Use of the term "the" to modify the object "proximate cause" does not compel the conclusion that the phrase means sole cause. Further, construing the phrase, "the proximate cause" to require sole proximate cause would contradict the common law's longstanding recognition that there may be two or more concurrent and directly cooperative and efficient proximate causes of an injury. Absent some persuasive support that the Legislature intended to deviate from the common law's established recognition of concurrent proximate causation, there is neither textual nor historical basis to construe subsection 375(2) to require a showing of "sole" proximate causation. The limit of proximate cause is a question of public policy, and its boundaries depend on the type of case in which the Court is asked to determine those boundaries. As a matter of public policy, considering the treatment of proximate cause in tort and worker's compensation cases, death is within the range of compensable consequences if the injury was a substantial factor in the death.

2. Subsection 375(2) does not exclude death benefits where the events leading to the death flow in a clear and unbroken chain of causation; thus, in this case, the decedent's death falls within the range of compensable consequences. The decision of the WCAC fails to comply with the legal requirement that, for the purpose of determining compensation, employers are required to take employees as they find them. The only issue is whether there is sufficient evidence to show a clear and unbroken chain of causation so that the injury was a directly and substantially related cause of the death. By concluding that the decedent's preexisting condition was the sole legally causative factor in his death, the approach of the Court of Appeals and the WCAC elides the principle that an injured employee's preexisting weaknesses are irrelevant to the inquiry into causation, and avoids both the legal and factual inquiry regarding independent intervening cause.

3. Absent unreasonable risk, an employee must submit to reasonable medical treatment or release the employer from the obligation of maintenance. In light of this, it cannot be concluded that the Legislature intended to curtail the right to death benefits where medical complications result in death. Rather, the consequences of medical treatment, even where those consequences result in death, are within the range of compensable consequences where the chain of causation is clear and unbroken. Where the plaintiff can show a direct causal connection between the work-related injury and the subsequent death, or a sequence of events that, while unexpected and unusual, are not uninterrupted by causes so unexpected as to

break the chain of causation, the plaintiff has met the threshold requirement for proximate cause as a matter of law under subsection 375(2). Preexisting medical conditions are not sufficient as a matter of law to break the chain of causation. Likewise, aggravating medical consequences will not break the chain of causation where the injury necessitates foreseeable medical treatment and there is an evidentiary foundation that supports the conclusion that there was a clear and unbroken chain of events leading to death.

4. In this case, the decedent's death arose directly as a result of his compliance with the law and the advice of medical professionals. The evidence supported the magistrate's conclusion that the death was sufficiently traceable to the work-related injury to establish compensability according to that standard.

Reversed.

Justice TAYLOR, joined by Justices BRICKLEY and WEAVER, dissenting, stated that the decedent's death is not compensable under the worker's compensation act because the work-related injury was not its sole proximate cause.

The words of subsection 375(2) should be applied as written and the analysis confined to ascertaining whether the decedent's work-related back injury was the proximate cause of his death, applying that term as normally understood in tort law at the time the act was adopted. The decedent's injury was not a life-threatening condition. There were a series of tragic and unlikely events following his workplace injury that occasioned death. Thus, his injury was not the proximate cause of his death, and no death benefits should be awarded.

218 Mich App 19; 553 NW2d 623 (1996) reversed.

*Williams, Fotieo, Szczytko & Fedewa* (by *Paul A. Williams*) for the plaintiff-appellant.

*Smith, Haughey, Rice & Roegge* (by *Lance R. Mather*) for the defendant-appellee.

BOYLE, J. We granted leave to appeal to examine the Legislature's use of the phrase "proximate cause" in MCL 418.375(2); MSA 17.237(375)(2), which provides for survivor's benefits under the worker's compensation act.[1] We decline to take up the cudgel with

---

[1] MCL 418.375; MSA 17.237(375) provides in relevant part:

regard to the dissent's scholarly exploration of the evils of judicial legislation or to reconsider the holding in *Dedes v Asch*, 446 Mich 99; 521 NW2d 488 (1994).[2] Because the circumstances of decedent's

---

(1) The death of the injured employee before the expiration of the period within which he or she would receive weekly payments shall be considered to end the disability and all liability for the remainder of such payments which he or she would have received in case he or she had lived shall be terminated, but the employer shall thereupon be liable for the following death benefits in lieu of any further disability indemnity.

(2) If the injury received by such employee was the proximate cause of his or her death, and the deceased employee leaves dependents . . . , the death benefit shall be a sum sufficient . . . to make the total compensation for the injury and death exclusive of medical . . . and rehabilitation services, and expenses . . . equal to the full amount which such dependents would have been entitled to receive under the provisions of section 321, in case the injury had resulted in immediate death.

MCL 418.321; MSA 17.237(321) provides for computation of death benefits at eighty percent of the employee's after tax weekly wage for a period of five hundred weeks for persons wholly dependent on the decedent and for benefits in proportion to the level of dependency for persons partially dependent on the decedent.

[2] We decline the invitation to reconsider *Dedes*, which involved a different context. Furthermore, the relevance of a discourse on the obligation to effectuate legislative intent is not apparent, given that the dispute here is really a matter of how the law ought to be applied to the facts. Whether we characterize the standard as one of primary causation, consistent with our jurisprudence on the subject, or as one of "sole" proximate causation, consistent with the dissenting opinion, the result would be the same. Although the dissent implies that some "extrinsic force," *post* at 759, intervened to cause the death so that the injury resulted from the unfolding of "a series of tragic and unlikely events," *id.* at 754, the dissent never identifies the extrinsic force interrupting the chain of causation and differentiating this case from our earlier jurisprudence. The decedent's hypertension and medication cannot be so identified because they are part of a preexisting condition. The defendant takes the employee as he finds him. The myelogram was necessitated by the injury, making it, along with its complications, a foreseeable consequence of the injury that does not interrupt the chain of causation. Decedent's ingestion of water indicates compliance with the necessary treatment (another foreseeable consequence of the injury), and an allegation of excessive ingestion would amount to an allegation of contributory negligence not legally recognizable under the WDCA. None of the relevant "forces" was "extrinsic" (or a superseding

death were within the range of compensable conse-
quences under subsection 375(2), we reverse the deci-
sion of the Court of Appeals and reinstate the deci-
sion of the magistrate.

I

Plaintiff's decedent, Keith Hagerman, worked as a
millwright for defendant from April 16, 1984, until
December 20, 1989. Decedent sustained a back injury
at work on August 25, 1987, while trying to move a
five hundred pound barrel. He returned to work, but
sustained further aggravating injury to his back until
he could no longer work as of December 20, 1989.
Defendant paid benefits from decedent's last day of
work until his death on March 28, 1990.

As part of the medical treatment of the injury,
decedent's doctor ordered a myelogram to diagnose
the extent of the injury and indicate the desirability of
surgery. When decedent underwent this diagnostic
medical procedure on March 7, 1990, a nurse advised
him that successful recovery from the myelogram
required that he consume large quantities of water
before and after the procedure. As a result of this
medical advice, after leaving the hospital, decedent

cause) because none of them could have caused the death alone or con-
currently with the other causes independently of the single occurrence
that irrefutably set in motion the chain of events leading to Mr. Hager-
man's death. Thus, even if we adopted the "sole" proximate causation
standard advocated by defendant and the dissent, the conclusion would
be inescapable that the single legally recognized primary and proximate
cause of Mr. Hagerman's death was the work-related injury that is not too
remote, given the clear and unbroken nature of the chain of events
directly tying the death to the injury. Although tragic and unlikely, the
chain is direct and the consequences are not so remote as to preclude lia-
bility under subsection 375(2).

consumed a sixteen ounce glass of water every ninety minutes.

Decedent suffered from high blood pressure for which he was taking the diuretic drug Aldoril. On the nights of March 8 and 9, decedent was hospitalized. It is undisputed that the high water intake, combined with the diuretic action of the Aldoril, depleted the sodium levels in his body, causing convulsions or seizures, that decedent aspirated gastric contents into his lungs as a result of the convulsions or seizures, which caused pneumonia and coma, and that decedent died of cardiac arrest on March 28, 1990.

Decedent's widow sought death benefits on April 12, 1990. Under subsection 375(2) of the worker's compensation act, when death is not immediate, the survivor seeking death benefits must show that a work-related injury was the "proximate cause" of the death. The magistrate awarded plaintiff benefits, concluding that the requirements of subsection 375(2) had been met by "[a] chain of medical causation [that was], although unexpected and unusual, . . . clear and unbroken."[3] Citing 1 Larson, Workers' Compensation, § 13.21, the magistrate reasoned that "[t]he great weight of authority recognizes that the adverse consequences of medical management of a work related condition results in a compensable circumstance." The magistrate specifically held:

---

[3] The magistrate found that decedent sustained a work-related back injury, that the work-related injury necessitated the myelogram, that decedent's ingestion of large amounts of water was consistent with the medical recommendations he received in association with the myelogram, and that he died from a combination of sodium deficiency and aspiration pneumonia resulting from the myelogram.

[T]he myelogram was necessitated by the work related injury. It is not an intervening, superseding event, unrelated to the original injury. It does not break the chain of causation. It is but one event occurring in an unbroken sequence of events flowing from, and necessitated by, the injury.

The Worker's Compensation Appellate Commission reversed, concluding that the death "was the result of medication designed to control his high blood pressure, a preexisting condition. . . . [T]he medication was an independent cause which lead [sic] to plaintiff's death." 1993 Mich ACO 845, 847. The Court of Appeals originally reversed in a peremptory order, but, on subsequent plenary consideration, the Court affirmed the WCAC, concluding that plaintiff had failed to establish that decedent's death was proximately caused by the work-related injury. 209 Mich App 667; 531 NW2d 832 (1995).

Plaintiff sought leave to appeal in this Court. We remanded for reconsideration in light of *Dedes v Asch, supra,* in which we held that the phrase "the proximate cause" in the governmental immunity statute, MCL 691.1407(2)(c); MSA 3.996(107)(2)(c), does not require the plaintiff to establish that the defendant's conduct was the *sole* proximate cause of plaintiff's injuries. 451 Mich 874 (1996). On remand, the Court of Appeals did not apply *Dedes*. Rather, on further examination of the proximate cause issue, the Court of Appeals affirmed the WCAC, concluding that the work-related injury and the myelogram were not substantial factors in the death and that public policy could not support holding defendant to a duty to protect decedent from the harm suffered. 218 Mich App 19; 553 NW2d 623 (1996). Thus, both the WCAC and the Court of Appeals essentially attributed the death to

the preexisting medical condition. We conclude that the Court of Appeals erred. The evidence was sufficient to support the magistrate's conclusion that the injury was the primary moving or substantial cause of the death. We vacate and affirm the decision of the magistrate.

II

A

"[T]he findings of the magistrate are conclusive when supported by substantial, competent, and material evidence . . . ." *Goff v Bil-Mar Foods (After Remand)*, 454 Mich 507, 511; 563 NW2d 214 (1997). "The question we are faced with on judicial appellate review . . . is 'whether the WCAC acted in a manner consistent with the concept of administrative appellate review that is less than de novo review in finding that the magistrate's decision was or was not supported by competent, material, and substantial evidence on the whole record.'" *Id.*, quoting *Holden v Ford Motor Co*, 439 Mich 257, 267-268; 484 NW2d 227 (1992). In applying subsection 375(2) in the instant case, and upholding the decision of the WCAC, the Court of Appeals employed an erroneous legal framework and based its decision on erroneous legal reasoning. Questions of law are reviewed de novo. *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).[4]

---

[4] While "factual determinations of the commission, if acting within the scope of its powers, shall be conclusive," *Goff, supra* at 512, de novo judicial review is appropriate where an incorrect legal standard is employed. The WCAC concluded that the magistrate "applied an incorrect legal standard," 1993 Mich ACO 846 and reversed the award of death benefits because it believed that death "was the result of medication designed to

B

"[F]or centuries judges, lawyers and writers have used the phrase 'proximate cause' to indicate a cause of which the law will take notice." Perkins & Boyce, Criminal Law (3d ed), p 774. We attribute no greater or lesser intent to the Legislature in enacting § 375 than to ensure "legally recognized cause." *Id.* at 776. Construing the text reasonably to contain all that it fairly means, we find no basis to conclude that legally recognized cause under subsection 375(2) means sole proximate cause.

We need not revisit our decision in *Dedes, supra,* that "[t]he word 'the' before 'proximate cause' is not to be read to limit recovery if the plaintiff or another is also a cause . . . [or] to prevent a defendant from claiming comparative negligence . . . ." *Id.* at 118. Rather, for purposes of the question presented here, we need only observe that our reading of subsection 375(2) is consistent with the dictionary definitions of "a" and "the."

> A. . . . The word "a" has varying meanings and uses. "A" means "one" or "any," but less emphatically than either. . . . [Black's Law Dictionary (5th ed), p 1.]

> The. An article which particularizes the subject spoken of. "Grammatical niceties should not be resorted to without necessity; but it would be extending liberality to an unwarrantable length to confound the articles "a" and "the." The

---

control [decedent's] high blood pressure, a preexisting condition." *Id.* at 847. As explained below, the view that attributing the death to a preexisting condition defeats causation under these circumstances is legally erroneous.

most unlettered persons understand that "a" is indefinite, but "the" refers to a certain object. [*Id.* at 1324.][5]

"Proximate cause" generally refers to the "primary or moving cause." *Id.* at 1103. Therefore, while "a" force might be one of a series of causes, "the" primary or moving force, does not logically or linguistically negate the existence of other forces. Stated otherwise, use of the term "the" to modify the object "proximate cause" does not compel the conclusion that the phrase means *sole* cause. Recognition of the fact that "proximate cause" means, in broad terms, "primary cause," requires us to also acknowledge the existence of other legally recognizable causes. Thus, we refuse defendant's invitation to engraft the word "sole" onto the statute between "the" and "proximate cause" and instead look to the common law to understand the meaning of the phrase "the proximate cause" in the WDCA.

### 1. THE HISTORICAL CONTEXT

A conclusion that the Legislature intended sole causation in subsection 375(2) would not only ignore the text of the statute, it would also be inconsistent with concurrent causation principles predating the enactment of the predecessor of subsection 375(2) in 1912.[6] The law has consistently recognized that there may be more than one proximate cause.

---

[5] The dissent questions our reference to Black's. However, we find no real inconsistency between its discussion and that to which the dissent refers. Given that "proximate cause" is a term of art, resort to a legal dictionary in a discussion of its meaning and application is appropriate.

[6] Proximate cause, whether informed by the substantial factor test, or the discussion of intervening and superseding causes, by acknowledging the possibility of concurrent proximate causes, is foreign to the notion that some factor must be the sole proximate cause. See, e.g., *Welch v*

The worker's compensation act eliminates contributory negligence (unless wilful) as a defense in death cases[7] and thus explicitly refutes any contention that the Legislature employed the phrase "the proximate cause" in 1912 as a reference to contributory negligence principles that existed at the time. *Post* at 762-763.[8] Moreover any suggestion that principles of the doctrine of contributory negligence support the Legislature's intention to apply a standard of "sole" causation bespeaks a misunderstanding of common-law contributory negligence, which was an affirmative defense that barred the plaintiff from recovery. There

---

*Jackson & Battle Creek Traction Co*, 154 Mich 399, 407-408; 117 NW 898 (1908).

[7] MCL 418.141; MSA 17.237(141) states:

In an action to recover damages for personal injury sustained by an employee in the course of his employment or for death resulting from personal injuries so sustained it shall not be a defense:

(a) That the employee was negligent, unless it shall appear that such negligence was wilful.

(b) That the injury was caused by the negligence of a fellow employee.

(c) That the employee had assumed the risks inherent in or incidental to, or arising out of his employment, or arising from the failure of the employer to provide and maintain safe premises and suitable appliances.

[8] The dissent contends that *Stoll v Laubengayer*, 174 Mich 701, 706; 140 NW 532 (1913), established the general rule of the day that proximate cause was defined as "the immediate efficient, direct cause preceding the injury." However, as noted below, that was merely one of several definitions considered in *Stoll*, and the rule to be gleaned from that case is that proximate cause is a case-by-case analysis. The *Stoll* Court recognized that, as of 1913, the year *after* enactment of the WDCA, "[n]o general or authoritative definition [of proximate cause] ha[d] been evolved . . . ." *Id.* at 704. Nevertheless, the language cited by the dissent does not require proof of the sole cause or the last cause preceding the injury. Rather, the key word being "efficient," it references primary cause. Moreover, that description fits the facts and circumstances of *Stoll* because it described the influence of plaintiff's decedent's act in voluntarily riding her sleigh down an incline.

is no foundation in the common law for the notion that, because contributory negligence was a defense, the acts of the defendant on which liability was premised were required to be the sole cause of injury. In other words, while contributory negligence was an independent intervening cause that would bar recovery, if there was no contributory negligence, the defendant might or might not be responsible, depending on whether the injury was proximately caused by the act that was alleged to impose liability. It is axiomatic that the existence of concurrent proximate causes at common law did not bar recovery.

As early as *Gage v Pontiac, O & N R Co*, 105 Mich 335; 63 NW 318 (1895), this Court recognized the existence of concurrent proximate causes contributing to the plaintiff's injury. The plaintiff was injured when she was thrown from her carriage after the horse drawing the carriage, while crossing a bridge, "made a sudden shy[9] to the right," *id.* at 339, and went over the side of the bridge. The plaintiff claimed the absence of guardrails on the bridge was the proximate cause of her injuries, while the defendant maintained it was the horse's shy that proximately caused the injuries. The Court held:

> [I]t cannot be said, as a matter of law, that the mere shying of the horse, and not the improper and dangerous condition of the highway, was the proximate cause of the injury. They were apparently concurring causes,—the one, the shying of the horse, where neither party can be said to be in fault; and the other, the defect in the highway, for which, under the finding of the jury, the defendant company is responsible. [*Id.* at 342.]

---

[9] The *Random House College Dictionary* defines "shy," as it relates to horses, as "to start back or aside, as in fear." *Id.* at 1220.

The Court supported its decision not to disturb the jury's decision on appeal with reference to *Houfe v Town of Fulton*, 29 Wis 296 (1871):

> [In that case], it was held that where, besides the defect in the highway, there is *another proximate cause contributing directly to produce the injury*, which cause is not attributable to plaintiff's negligence nor that of any third person, the town is still liable in case the jury find that the damage would not have been sustained but for the defect in the way. [*Gage, supra* at 343 (emphasis added).]

The common-law understanding of concurrent proximate causation has obtained through recent statutory modifications.[10] Thus, in 1946, this Court, relying in part on *Gage*, unanimously stated:

> "Since a concurring cause may be a proximate cause, the rule is that one is liable to respond in damages for an injury which was the natural and probable result of the concurrence of his negligence with the negligence of another, or with an act of God or pure accident, or with an inanimate cause, notwithstanding his lack of responsibility for the other cause." [*Brackins v Olympia, Inc*, 316 Mich 275, 281; 25 NW2d 197 (1946).]

The *Brackins* Court's discussion of this rule also included the specific acknowledgment not only that there may be more than one proximate cause, but that where this is the case, the negligent wrongdoers cause may be referred to as "the proximate cause":

---

[10] See, e.g., MCL 600.6304; MSA 27A.6304 (comparative fault). By utilizing pure comparative negligence, the Legislature leaves defendants seeking to avoid liability altogether with one argument regarding the plaintiff's conduct—that the plaintiff was one hundred percent at fault for the alleged damages, i.e., that plaintiff's conduct was the sole cause of the injuries for which he seeks recovery.

"[T]here may be two or more concurrent and directly cooperative and efficient *proximate causes* of an injury. Negligence which was operative at the time an injury was inflicted may constitute *the proximate cause* of the injury and be actionable, notwithstanding it concurred with the act of a third person to produce the injury." [*Id.* (emphasis added).][11]

Thus, construing the phrase, "the proximate cause" to require sole proximate cause would contradict the common law's longstanding recognition of the fact that, "there may be two or more concurrent and directly cooperative and efficient proximate causes of an injury." *Id.* Absent some persuasive support that

---

[11] Lest there be any doubt about the applicability of these concurrent proximate causation rules at the time the Legislature enacted the predecessor to subsection 375(2) in 1912, see *Cavanaugh v Michigan Central R Co*, 175 Mich 156, 160; 141 NW 539 (1913), where Justice BIRD's dissent reflected on Justice COOLEY's treatment of the issue in his treatise on Torts:

"If the original act was wrongful, and would naturally, according to the ordinary course of events, prove injurious to some other person or persons, and does actually result in injury through the intervention of other causes which are not wrongful, the injury shall be referred to the wrongful cause, passing by those which were innocent. . . . It is equally true that no wrongdoer ought to be allowed to apportion or qualify his own wrong, and that, as a loss has actually happened whilst his own wrongful act was in force and operation, he ought not to be permitted to set up as a defense that there was a more immediate cause of the loss, if that cause was put in operation by his own wrongful act. To entitle such party to exemption, he must show, not only that the same loss might have happened, but that it must have happened if the act complained of had not be done . . . ."

Although the *Cavanaugh* majority disagreed regarding the result that Justice BIRD would have reached, the discussion from Cooley authoritatively supports our understanding of the nature of the proximate cause inquiry circa 1912. Cf. *Stoll*, n 8 *supra* at 704 (observing the absence of a general and authoritative definition of proximate cause applicable in all cases, instead looking to the peculiar facts and circumstances of the given case).

the Legislature intended to deviate from the common law's established recognition of concurrent proximate causation, we have neither textual nor historical basis to construe subsection 375(2) to require a showing of "sole" proximate causation.[12]

Having determined that there is no basis to conclude that the Legislature intended the phrase "the proximate cause" to mean the sole cause, we offer some additional observations before turning to the application of § 375 to the facts before us.

### 2. THE LIMIT OF PROXIMATE CAUSE IS A MATTER OF PUBLIC POLICY

Proximate causation is not determined by "application of some rule-of-thumb." Perkins & Boyce, *supra* at 779. "[S]olutions dependent upon purely mechanical rules would produce absurd results . . . ."[13] *Id.*

---

[12] Indeed while the dissent suggests that our holding launches a judicial missile of unbridled judicial activism that will precipitate further revisionist thinking, the claim is vastly overblown. The dissent is unable to cite a single case standing for the proposition that "the proximate cause" means *sole* proximate cause. The claim that we are "fundamental[ly] unwilling[] to apply the plain meaning of the text as written by the Legislature," *post* at 756, is both unfounded and ironic. It is the dissent that would conflate the word "the" into "sole" to fundamentally alter the legal landscape created by the Legislature. Our understanding of the phrase "proximate cause" is the understanding expressed by this Court before, after, and contemporaneously with enactment of the WDCA. This understanding informed the context in which the act was written. Given that "proximate cause" is, as the dissent acknowledges, a "term of art," *id.* at 752, that has its origins in the common law, we conclude that the Legislature's understanding of the phrase was consistent with this Court's jurisprudence applying it case by case, and not with the dissent's insistence on the unsupportable and unsupported conclusion that "the" means "the sole." The heroic effort of the dissent notwithstanding, the inquiry into proximate causation is a question of remoteness, not semantics.

[13] Indeed, it was noted about the time the Legislature enacted the worker's compensation act that "all attempts hitherto made at laying down universal tests [for proximate cause] of a more definite and more specific nature have resulted in propounding rules which are demonstra-

Perkins & Boyce explain the difficult task of determining the boundaries of legally recognized causation:

> Whether the term used is "proximate cause," "legal cause," "jural cause," or some equivalent, the idea sought to be expressed is "legally-recognized cause," which should be promptly tested by the question,—legally recognized for what purpose? The matters of policy which determine just where the limitations of juridical recognition shall be placed upon the broad field of actual cause, are grounded partly upon expediency and partly upon notions of fairness and justice, although even proximate cause must be distinguished from the concept of responsibility. Since the boundary lines of proximate cause are governed by these considerations they may, and in fact do, vary according to the jural consequences of the particular kind of case involved. The line of demarcation between causes which will be recognized as proximate and those which will be disregarded as remote "is really a flexible line." "Legal causation reaches further" in some types of cases than it does in others. It reaches further in tort actions based upon intentional harm than in those resulting from negligence, *and neither of the boundaries so established is necessarily controlling in other types of cases, such as actions for breach of contract, those under Workmens' Compensation Acts, or criminal prosecutions. [Id.* at 776 (emphasis added).]

Thus, the limit of proximate cause is a question of public policy,[14] and its boundaries depend on the type

---

bly erroneous." Smith, *Legal cause in actions of tort,* 25 Harv L R 303, 317 (1912). Even earlier, Chief Justice COOLEY noted in passing, "The application of the rule that the proximate, not the remote cause is to be regarded, is obscure and difficult in many cases . . . ." *Lewis v Flint & P M R Co,* 54 Mich 55, 64; 19 NW 744 (1884).

[14] See, e.g., *Davis v Thornton,* 384 Mich 138, 146; 180 NW2d 11 (1970) ("Causation is a process of logical determination, while the significance of the connections—remoteness—is a policy determination"); *Palsgraf v Long Island R Co,* 248 NY 339, 352; 162 NE 99 (1928) (Andrews, J., dissenting) ("What we do mean by the word 'proximate' is that, because of

of case in which the Court is asked to determine those boundaries.

C

The parties claim that no authority from this Court establishes the boundaries of proximate causation under subsection 375(2). The defendant argues, consistent with the decision of the Court of Appeals, that we should apply principles of tort law to determine the boundaries of proximate cause under the act, or defer to the WCAC's findings of fact.[15] The Court of Appeals held "that as a matter of public policy defendant should not be held to have a duty to protect plaintiff's husband from the harm he suffered in the instant case." 218 Mich App 24. We hold, as a matter of public policy, considering our historical treatment of proximate cause in tort and worker's compensation cases, that death is within the range of compensable consequences if the injury was a substantial factor in the death, and, we acknowledge, in the absence of a universally applicable test for proximate cause, that such decisions will almost always turn on the facts and circumstances presented in a given case. See, e.g., *Stoll v Laubengayer*, 174 Mich 701, 704; 140 NW 532 (1913). Here, because the work-related injury began a clear and unbroken chain of events that led to the decedent's death, the injury was

_____

convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point"); see also, *Williamson v Waldman*, 150 NJ 232, 245; 696 A2d 14 (1997) ("[T]he limit of proximate cause is, ultimately, an issue of law and similarly entails a consideration of public policy and fairness"); *Marsh v Commonwealth Land Title Ins Co*, 57 Wash App 610, 622; 789 P2d 792 (1990), review den 115 Wash 2d 1025 (1990).

[15] See *Goff, supra* at 511-512.

a substantial factor. In other words, we conclude that the magistrate applied the correct legal standard and that the conclusions were supported by competent, material, and substantial evidence on the whole record.

In reaching its conclusion, the Court of Appeals applied the substantial-factor test commonly employed to determine proximate causation in negligence cases:

> When a number of factors contribute to produce an injury, one actor's *negligence* will not be considered a proximate cause of harm unless it was a substantial factor in producing the injury. . . . Among the factors to be considered is whether the actor's conduct created a force or series of forces that were in continuous and active operation up to the time of the harm, or created a situation harmless in itself unless acted upon by other forces for which the actor is not responsible. . . . We conclude that the back injury and myelogram did not constitute a substantial factor in producing the injury, and so did not proximately cause the injury. [218 Mich App 23 (emphasis added).]

We agree with the Court of Appeals that the substantial-factor test is relevant in determining proximate causation. However, we do not agree with the Court's application in the instant case, nor with its endorsement of the WCAC's failure to recognize that preexisting conditions will not bar recovery. Section 141 excludes the decedent's contributory negligence as an intervening cause under § 375. The phrase "proximate cause" in subsection 375(2) does not exclude death benefits where the events leading to the death flow in a clear and unbroken chain of causation; thus, decedent's death falls within the range of compensable consequences. We reject the decision of

the WCAC because it fails to comply with the legal requirement that the employer take the employee as he finds him, with all preexisting conditions and frailties, for the purpose of determining compensation.[16] The evidentiary issue is one of remoteness, that is, whether there is sufficient evidence to show a clear and unbroken chain of causation so that the injury was a directly and substantially related cause of the death.

D

Subsection 375(2) adopts a higher standard for awarding benefits than that adopted in § 301.

Subsection 375(2) requires an analysis of whether death was proximately caused by the original injury. Subsection 301(1) requires only the question whether the injury arose out of and in the course of employment. The inquiry into whether a clear and unbroken chain of causation sufficient to show the injury was a directly and substantially related cause of death (subsection 375[2]) is not the same as an inquiry into

---

[16] In *Stoll, supra* at 705, while recognizing that this Court had "never apparently attempted to accurately define the term 'proximate cause,' " the Court acknowledged the principle announced in *Borck v Michigan Bolt & Nut Works*, 111 Mich 129, 133; 69 NW 254 (1896):

The damage to be recovered in an action must always be the natural and proximate consequence of the wrongful act complained of. If a new force or power has intervened, of itself sufficient to stand as the cause of the mischief or injury, the first must be considered as too remote.

We respectfully disagree with the dissent's conclusion that the injury was too remote in this case. Under these circumstances, neither the preexisting hypertension and medication therefor nor the decedent's compliance with medical advice he received was sufficient to stand alone as the cause of the death, independent of the injury necessitating the myelogram.

whether there is a mere causal nexus between the injury or employment (subsection 301[1]).

For example, in *Hammons v Highland Park Police Dep't*, 421 Mich 1, 9; 364 NW2d 575 (1984), the Court held death by suicide compensable as a personal injury arising out of and in the course of employment where there was an adequate causal nexus between the suicide and the work-related injury. The question of intervening causation under subsection 375(2) was not presented in *Hammons*, which was apparently treated as an immediate death case. However, recovery of death benefits in nonimmediate death cases requires an additional hurdle beyond the "arising out of and in the course of employment" causal nexus, namely, proximate cause and the absence of intervening or superseding causes, such as decedent's wilful conduct, sufficient to break the chain of causation. Thus, for example, death by suicide, if wilful, would appear to be noncompensable under subsection 375(2). The phrase "proximate cause" is an inherently limiting phrase.

Certain general principles govern any inquiry into the applicability of a provision of the worker's compensation act. Particularly relevant here are two often-cited principles: First, the worker's compensation act is remedial in nature, and must be "liberally construed to grant rather than deny benefits." *Sobotka v Chrysler Corp (After Remand)*, 447 Mich 1, 20, n 18; 523 NW2d 454 (1994) (BOYLE, J., lead opinion); see, also, *Gardner v Van Buren Public Schools*, 445 Mich 23, 49; 517 NW2d 1 (1994). Second, for the purpose of determining compensability of an injury or death, courts will require that employers take their employees as they find them. *Zaremba v Chrysler*

*Corp*, 377 Mich 226, 231-232; 139 NW2d 745 (1966).[17]
These general principles apply to both injury and sub-
sequent death cases, as does abrogation of the
defenses of contributory negligence, negligence of a
coemployee, and assumption of the risk under § 141.

MCL 418.301(1); MSA 17.237(301)(1) provides the
general rule for causation under the act:

> An employee, who receives a personal injury arising out
> of and in the course of employment by an employer who is
> subject to this act at the time of the injury, shall be paid
> compensation as provided in this act. In the case of death
> resulting from the personal injury to the employee, compen-
> sation shall be paid to the employee's dependents as pro-
> vided in this act.

Justice WILLIAMS, writing for the Court, eloquently
reminded us of the implications of the Legislature's
selection of the "arising out of and in the course of
employment" standard for causation in supplying a
system for compensation of injured employees and, in
cases of death, the dependents of those employees:

> In fact, it might be said that workmen's compensation,
> like the gentle rain from heaven, falls upon the just and
> unjust alike so long as the injury arose out of and in the
> employment ambience. [*Thomas v Certified Refrigeration,
> Inc*, 392 Mich 623, 637; 221 NW2d 378 (1974).]

Section 301 imposes liability where the injury arises
out of the employment without reference to fault.
Subsection 375(2) likewise imposes liability without
respect to fault, but requires closer examination of
the causal connection. However, in concluding that

---

[17] The rule is well settled and generally accepted. See, e.g., *In re Mad-
den*, 222 Mass 487, 493-494; 111 NE 379 (1916).

the defendant's preexisting condition was the sole legally causative factor in his death, the approach taken by the Court of Appeals and the WCAC elides the principle that an injured employee's preexisting weaknesses, here the decedent's high blood pressure, are irrelevant to the inquiry into causation, and it avoids both the legal and factual inquiry regarding independent intervening cause.

The magistrate correctly observed that "[t]he great weight of authority recognizes that the adverse consequences of medical management of a work related condition results in a compensable circumstance." Larson states:

> It is now uniformly held that aggravation of the primary injury by medical or surgical treatment is compensable. Examples include exacerbation of the claimant's condition, *or death*, resulting from [for example] antibiotics, antitoxins, sedatives, pain-killers, anesthesia, electrical treatments, or corrective or exploratory surgery. [Larson, *supra*, § 13.21(a), pp 3-699 to 3-711.]

We have followed this rule at least since our decision in *Oleszek v Ford Motor Co*, 217 Mich 318; 186 NW 719 (1922). There, we held that the plaintiff could recover where he ultimately lost his leg because of infection after suffering an injury of his ankle at work. The plaintiff's original injury was fairly minor, but subsequent infection after several attempts at treatment resulted in amputation. We stated:

> Where there is a right of recovery due to the original injury and the disability at the time of the hearing is directly traceable thereto, the intervention of other and aggravating causes by which such disability has been increased, if the claimant is not himself to blame therefor, is no bar to his recovery. . . . The rule is thus stated . . . :

"Where the immediate agency causing the death or sec-
ond injury is one which the first injury rendered it essential
to employ, the employer has been held liable for the result-
ing death or injury." [*Id.* at 321-322.]

Thus, we concluded that the relevant inquiry
focused on whether "disability . . . was caused by,
or directly traceable to, the injury resulting from the
accident," *id.* at 322, and precluded plaintiff from
suing for damages at law, i.e., for negligence. The
Court of Appeals correctly recognized that under
*Oleszek*, "[a]n employer is liable for additional injuries
or complications that result when an employee sub-
mits to medical procedures necessitated by work-
related injuries." 218 Mich App 22-23. However, the
Court of Appeals and the WCAC erred in denying com-
pensation on the legal basis that, because decedent
had a preexisting condition, the results here were too
remote.

In the presence of a causal relationship not so
attenuated that a court can permissibly conclude that
the original injury was not a moving or substantial
cause of the ultimate injury, a court cannot conclude
under traditional definitions of proximate cause that
necessary medical treatment that resulted in death is
not legally cognizable. Larson's view of the uniform
rule regarding aggravating medical consequences and
*Oleszek* is consistent with these definitions.

Moreover, it is well established that an employee
has a "duty to minimize . . . damages by obtaining
proper medical or surgical treatment." *Smith v Jones*,
382 Mich 176, 186; 169 NW2d 308 (1969). Absent
unreasonable risk, an employee must submit to rea-
sonable medical treatment or "release his employers

from the obligation to maintain him."[18] *Kricinovich v American Car & Foundry Co*, 192 Mich 687, 690; 159 NW 362 (1916). See, also, *Workers' Compensation: Reasonableness of employee's refusal of medical services tendered by employer*, 72 ALR4th 905. In light of the fact that injured employees are required by law to submit to medical treatment, we decline to conclude that the Legislature intended to curtail the right to death benefits by imposing a requirement of sole proximate cause where medical complications result in death. We reaffirm our holding in *Oleszek*, that the consequences of medical treatment, even where those consequences result in death, are within the range of compensable consequences where the chain of causation is clear and unbroken.

Although *Oleszek* did not directly involve nonimmediate death benefits under subsection 375(2), the Court's reference to death is consistent with cases decided directly under subsection 375(2) or its predecessors, before and after *Oleszek*.

In *Swanson v Oliver Iron Mining Co*, 266 Mich 121, 122; 253 NW 239 (1934), the plaintiff sought death benefits in the form of "the 300 weeks' compensation that had been awarded to her [deceased] husband . . . ." The decedent was injured in an explosion at the mine where he worked. He recovered and was able to walk on crutches, but did not work again. The decedent received compensation for the injury

---

[18] We find defendant's argument that benefits were paid voluntarily and that no one forced or persuaded decedent to undergo the myelogram unpersuasive. The obligation to mitigate is an independent obligation imposed on a plaintiff by law.

from 1927 until his death in 1932.[19] Justice POTTER,
writing for a unanimous Court, addressed the exact
issue we address today: "whether the injury suffered
by . . . plaintiff's husband . . . was the proximate
cause of his death . . . ." *Id.* at 122. The Court held:

> The question is whether the injury accelerated his death;
> whether, by reason of the injury suffered by him, his death
> occurred sooner than it probably otherwise would. There
> was testimony indicating the injury suffered lowered his
> vitality and probably shortened his life. This was sufficient.
> [*Id.*]

In *Neumeier v City of Menominee*, 293 Mich 646;
292 NW 511 (1940), the Court addressed the death
benefits question of proximate cause again and sus-
tained an award of death benefits. The decedent
dropped a plank on the toes of his right foot at work
in 1936. He failed to seek immediate medical atten-
tion, and, within a month, gangrene developed,
"necessitating the amputation of one toe." *Id.* at 648.
The gangrene progressed and the decedent's right leg
was amputated approximately one month later. While
this terminated the infection, the decedent died about
sixteen months later. "The causes of death were
thrombosis of the popliteal artery of his *left* leg,
*chronic* myocarditis, arteriosclerosis and toxemia
from a tumor in his mouth." *Id.* at 648 (emphasis
added). In determining "whether . . . there [was] any
competent testimony to support the . . . award," *id.*,
the Court rejected the argument that the death bene-
fits statute required a showing of sole proximate cau-

---

[19] The decedent in the present case died only three months after the
injury.

sation and sustained an award under 1929 CL 8428, a predecessor of § 375:

> It is true that [the treating physician's] testimony does not indicate that the injury was the sole cause of death. But in view of the decisions of this court, if there is competent testimony that the injury accelerated his death it is sufficient to be a proximate cause under the statute . . . . [*Id.* at 649.][20]

The Court addressed the same issue again in *Byrne v Clark Equipment Co*, 302 Mich 167; 4 NW2d 509 (1942). There, the decedent developed a hernia at work that required surgical repair. However, during the operation, the surgeon also decided to remove the decedent's appendix for reasons without apparent connection to the hernia injury. The decedent developed a postoperative infection and died of peritonitis. Plaintiff, decedent's wife, sought death benefits under a predecessor of subsection 375(2), 1929 CL 8428. Applying the proximate cause language in that section, the Court vacated an award of death benefits because the administrative tribunal found "that the source of the infection resulting in the death of the decedent *is unknown* and that it is not necessary to

---

[20] The *Neumeier* Court cited *Rickard v Bridgeman-Russell Co*, 288 Mich 175, 178; 284 NW 689 (1939), in which the question of proximate cause in a death benefit case was again held to turn on whether the injury probably accelerated death. The *Rickard* Court references five more cases that support this understanding of proximate cause in worker's compensation cases. For example, in *Waite v Fisher Body Corp*, 225 Mich 161, 163; 196 NW 189 (1923), the Court defined proximate cause as " 'the cause which directly set in motion the train of events which brought about the death.' " See also *Monk v Charcoal Iron Co of America*, 246 Mich 193, 195-196; 224 NW 354 (1929) (sustaining an award of death benefits in an immediate death case while recognizing that the shock and excitement contributing to the decedent's heart attack, in the presence of a possible "previous [heart] disease," need not have been "the sole, proximate cause"). *Id.* at 197.

determine the source of such infection." *Byrne* at 176 (emphasis added). The Court held:

> [P]laintiff has failed to sustain the burden of proving that the original hernia injury, through direct causal connection with the operation and resulting infection, was the proximate cause of her decedent's death. [*Id.* at 177.]

The *Byrne* Court reasoned that an award would be appropriate if plaintiff could show proximate cause through a direct causal connection between "the injury causing the hernia and the infection resulting from the operation for its repair," but that an award would not be appropriate if the infection resulted from the independent appendix removal procedure. *Id.*[21] Because the record did not reveal any evidence

---

[21] The dissent overlooks this distinction in its analysis of *Byrne* by oversimplifying the facts of that case. Moreover, the dissent fails to identify what independent factor in this case caused the decedent's death or broke the chain of causation. In *Byrne*, there was no recognizable legal relationship between the injury and the death because of the ambiguity raised by the doctor's decision to remove plaintiff's appendix independently of the work-related injury. Thus, the Court applied the following rule:

> "Where two inferences equally consistent with the facts arise . . . , one involving liability on the part of the employer . . . and the other relieving him from liability, the [plaintiff] must fail." [*Id.* at 178.]

In this case there is a clear and legally recognizable relationship among the injury, the ordered medical treatment, and the ultimate resulting complication of death. If the injury required a myelogram, and, in the process of administering that treatment, the doctor engaged in a course of conduct that constituted an independent intervening cause as a matter of law or if there was testimony that the conduct might have caused decedent's death, the situation would be entirely different because, like *Byrne*, the case would involve an ambiguity relevant to *independent, intervening* causation that might rise to the level of *superseding* cause. This is *not* such a case. *This case* involves a clear and unbroken chain of events, set in motion by the work-related injury, and not so attenuated as to justify a conclusion that the injury was too remote to stand as the legal cause of death under the WDCA.

regarding the source of the infection, the plaintiff could not show that death was proximately caused by the injury, and an award could not be sustained.

The conceptual framework uniting cases involving worker's compensation death benefits claims is acceleration of death on the basis of direct causal connection with the work-related injury. Whether concluding that acceleration of death is sufficient or that a direct causal connection is required, from the earliest days of this Court's interpretation of the worker's compensation act, see, e.g., *Fitzgerald v Lozier Motor Co*, 187 Mich 660, 666; 154 NW 67 (1915), through *Oleszek* (1922), *Swanson* (1934), *Neumeier* (1940), *Byrne* (1942), and the other cases cited above, the decisions present a clear and consistent understanding of proximate cause. In view of the overwhelming weight of the authorities, within our state and elsewhere, see, e.g., *Anderson v Industrial Ins Comm of Washington*, 116 Wash 421; 199 P 747 (1921), we reject both the conclusion of the Court of Appeals in sustaining the decision of the WCAC and the sole causation approach of the dissent.[22]

---

[22] Welch, Worker's Compensation in Michigan: Law & Practice, § 7.6, p 7-8, asserts that *Noble v Ford Motor Co*, 152 Mich App 622; 394 NW2d 50 (1986), altered our jurisprudence in this area. While we agree with the *Noble* Court that subsection 375(2) requires an inquiry separate and distinct from that which occurs under § 301, we find that the result in that case, that plaintiff had failed to show proximate cause, was driven by the plaintiff's inability to differentiate to any extent between the decedent's cigarette smoking and his occupational health risks for the purposes of showing causation. We agree with the results in *Noble* and in *Barnes v Campbell, Wyant & Cannon Foundry Co*, 188 Mich App 46; 469 NW2d 7 (1991), which also involved a decedent who was a heavy smoker. However, because we find them similar to *Byrne*, we would not interpret them as departing to any great extent from our earlier proximate cause jurisprudence.

Where the plaintiff can show a direct causal connection between the work-related injury and the subsequent death, or a sequence of events that, while unexpected and unusual, are not uninterrupted by causes so unexpected as to break the chain of causation, the plaintiff has met the threshold requirement for proximate cause as a matter of law under subsection 375(2). Testimony may establish a basis for finding that the death was not factually related to the original injury, but preexisting medical conditions are not sufficient as a matter of law to break the chain of causation.[23] Likewise, aggravating medical consequences will not break the chain of causation where the injury necessitates foreseeable medical treatment and there is an evidentiary foundation that supports the conclusion that there was a clear and unbroken chain of events leading to death.

E

We find the facts and circumstances of this case to be more like *Neumeier* than *Byrne*. The magistrate held that the death arose directly as a result of the decedent's compliance with the law and the advice of medical professionals in undergoing a myelogram and drinking plenty of water thereafter in order to properly treat or diagnose his work-related back injury. We agree with the magistrate's interpretation of the law, and we find his award supported by competent evidence, i.e., Dr. Dodson's report/testimony. The fact that decedent ingested an excessive amount of water is, on this record, irrelevant because contributory negligence is not a defense and defendant does not

---

[23] Our opinion in *Dean v Chrysler Corp*, 434 Mich 655; 455 NW2d 699 (1990), is not implicated here.

contend that decedent's conduct was an independent intervening cause. That decedent was complying with the legal requirement that he undergo reasonable medical treatment or forfeit his right to benefits precludes us from concluding that benefits are not payable where the complication resulting from the treatment ordered was death.

The magistrate correctly concluded that decedent's death was sufficiently traceable to the work-related injury to fall within the compensable range of consequences under subsection 375(2). The magistrate's ruling amounts to a finding that each step in the chain of causation was dependent on the existence of the work-related injury and its required treatment and that there was no intervening superseding cause sufficient to break the chain of causation. Consistent with the text of subsection 375(2), and long-established jurisprudence on the meaning of proximate cause, we decline defendant's invitation to read the phrase "proximate cause" to mean sole cause so as to yield a different result, and we specifically reject the notion that decedent's preexisting medical condition may be considered a superseding cause under these circumstances.

III

The magistrate applied the correct legal standard in considering whether the chain of medical causation was "clear and unbroken" and whether that chain established that the death resulted from "the adverse consequences of medical management of a work related condition . . . ." The evidence supported the magistrate's conclusion that the death was sufficiently traceable to the work-related injury to establish com-

pensability. We reverse the decision of the Court of Appeals and reinstate the magistrate's award of benefits.

MALLETT, C.J., and CAVANAGH and KELLY, JJ., concurred with BOYLE, J.

TAYLOR, J. (*dissenting*). I believe that the decedent's death is not compensable under the worker's compensation act because the work-related injury was not its sole proximate cause. Thus, I would affirm the result reached by the Court of Appeals and the WCAC.

Plaintiff's decedent, Keith Hagerman, incurred a work-related back injury in 1987. By the latter part of 1989, he could no longer work, his last day of work being December 20, 1989. After leaving work Mr. Hagerman underwent a myelogram at the direction of his physician. Medical personnel advised him to consume large amounts of water before and after the procedure. This he did, apparently drinking twenty to twenty-five quarts of water in the thirty-six hours following the myelogram. Unfortunately, Mr. Hagerman also suffered from non-work-related high blood pressure and took Aldoril, a diuretic, to treat this condition. The combination of the increased water consumption and the diuretic depleted sodium levels in his body. While sleeping, he suffered a convulsion or seizure. At some point, either during this initial seizure or later, Mr. Hagerman aspirated the contents of his stomach into his lungs, causing him to develop aspiration pneumonia. During an extended hospital stay his condition worsened. Mr. Hagerman's doctors had difficulty treating his pneumonia, and the treatment he received further damaged his lungs. Ultimately his family instructed his physicians to remove

various life support systems and he was designated as a "no code," meaning he would be allowed to die. Mr. Hagerman subsequently died of cardiac arrest.

The Court is presented with the question whether the worker's compensation statute, specifically MCL 418.375(2); MSA 17.237(375)(2), warrants an award of death benefits to Mr. Hagerman's survivors. Under subsection 375(2) dependents of a deceased employee are paid death benefits if the work-related injury was "the proximate cause" of the death. The majority concludes that this standard has been met. I disagree.

Section 301[1] articulates what a claimant must show to establish a compensable injury generally under worker's compensation. Injured employees are paid worker's compensation benefits for injuries "arising out of and in the course of employment." It is agreed by all that this is a liberal standard: The claimant need only show a reasonable relation of cause and effect between work and injury. No showing of proximate cause is necessary, and indeed other possible or probable causes of the injury do not have to be excluded beyond doubt. *Kepsel v McCready & Sons*, 345 Mich 335, 343-344; 76 NW2d 30 (1956). In using the new language of subsection 301(1) to allow recovery by the worker when the injury arose out of and in the course of employment, the Legislature lowered

---

[1]   An employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in this act. [MCL 418.301(1); MSA 17.237(301)(1).]

the burden from the venerable tort language of causa-
tion that had previously controlled.[2]

However, when it comes to death benefits, subsec-
tion 375(2)[3] contains an additional hurdle not present
for the claimant merely qualifying for benefits as a
result of injury or immediate death. Under subsection
375(2), death benefits are paid if the work-related
injury was "the proximate cause" of the employee's
subsequent death. *Id.* This distinction in the triggering
causation between these two sections of the act must
be given meaning. *Altman v Meridian Twp*, 439 Mich
623, 635; 487 NW2d 155 (1992), reh den 440 Mich 1204
(1992); *Melia v Employment Security Comm*, 346
Mich 544, 562; 78 NW2d 273 (1956).

My primary objection to the majority's resolution of
this question is that its construction of the phrase
"the proximate cause," as used in subsection 375(2),
negates any meaningful distinction between the
words "a" and "the" preceding the phrase "proximate
cause."

As a term of art, "proximate cause," was well
known in the law at the time the predecessor of sub-

---

[2] See *Noble v Ford Motor Co*, 152 Mich App 622, 626-627; 394 NW2d 50
(1986).

[3] If the injury received by such employee was *the proximate
cause* of his or her death, and the deceased employee leaves depen-
dents, as hereinbefore specified, wholly or partially dependent on
him or her for support, the death benefit shall be a sum sufficient,
when added to the indemnity which at the time of death has been
paid or becomes payable under the provisions of this act to the
deceased employee, to make the total compensation for the injury
and death exclusive of medical, surgical, hospital services,
medicines, and rehabilitation services, and expenses furnished as
provided in sections 315 and 319, equal to the full amount which
such dependents would have been entitled to receive under the
provisions of section 321, in case the injury had resulted in immedi-
ate death. [MCL 418.375(2); MSA 17.237(375)(2) (emphasis added).]

section 375(2) was enacted in 1912. Historically, proximate cause has been seen as that which was not a "secondary or remote cause." *Beall v Athens Twp*, 81 Mich 536, 540; 45 NW 1014 (1890). Put differently, this Court has characterized proximate cause as "the immediate efficient, direct cause preceding the injury." *Stoll v Laubengayer*, 174 Mich 701, 706; 140 NW 532 (1913).

Moreover, as noted by the majority, it has been well established in our law that there may be more than one proximate cause in any given case. *Ante*, pp 731-734. The Legislature explicitly demonstrated that it understood this facet of the law, i.e., multiple proximate causation, when it enacted the predecessors of MCL 418.141; MSA 17.237(141) and MCL 418.827; MSA 17.237(827). Section 141 removes negligence of the employee or a coemployee from consideration when the claimant seeks compensation for injuries or death sustained in the course of employment. Section 827 indicates that an employer will be fully compensated for worker's compensation payments made if an award for the same injury is obtained from a third party.

Given this nuanced understanding of "proximate cause" at the time this statute was enacted, one must then look to the meaning of "*the* proximate cause."

Traditionally in our law, to say nothing of our classrooms, we have recognized the difference between "the" and "a." "The" is defined as "*definite article.* 1. (used, esp. before a noun, with a specifying or particularizing effect, *as opposed to the indefinite or generalizing force of the indefinite article* a *or* an). . . ." *Random House Webster's College Dictionary*, p 1382. Further, we must follow these distinctions between

"a" and "the" as the Legislature has directed that "[a]ll words and phrases shall be construed and understood according to the common and approved usage of the language . . . ." MCL 8.3a; MSA 2.212(1). Moreover, there is no indication that the words "the" and "a" in common usage meant something different at the time this statute was enacted in 1912 than they do today.[4]

Consequently, I would apply the words of subsection 375(2) as written and confine my analysis to ascertaining whether Keith Hagerman's work-related back injury was "the proximate cause" of his death, applying that term as normally understood in tort law at the time that the act was adopted.[5] It is acknowledged that Mr. Hagerman's injury was not, in itself, a life-threatening condition. In fact, again as all acknowledge, there were a series of tragic and unlikely events following his workplace injury that occasioned his death. This means, applying the law as understood at the time of the enactment of this statute, that the injury was not *the* proximate cause of his

---

[4] The majority finds fault with the fact that I have not cited any case for the proposition that "the proximate cause" means the *sole* proximate cause. *Ante*, p 734, n 12. There is no need to because the statute is clear, and thus we should follow it. Moreover, it's worth noting that the majority cites no case to make the point that "a" equals "the." This is unsurprising, because its position is akin to a criticism that asserts that if you can't find a case that says a horse is not a cow, a horse is a cow. What this all comes down to is whether we will follow the Legislature's direction, MCL 8.3a; MSA 2.212(1), that the words it uses are to be given their common and usual meaning.

[5] While it is certainly true, as the majority notes, that application of the rule of proximate cause may be difficult in any given case, especially where several causes may be considered to be a proximate cause, such an observation does not diminish the fact that the phrase "the proximate cause" had an unambiguously understood definition in 1912. Moreover, the difficulty of application of that definition does not provide a justification for this Court changing, or redefining, what the Legislature enacted.

death.[6] At most it was *a* proximate cause of the death.[7] Consequently, I would hold that the Court of Appeals did not err in affirming the Worker's Compensation Appellate Commission conclusion that no death benefits should be awarded in this case.

To avoid the statutory language's requirement of sole proximate causation, the majority finds the words "a" and "the" synonymous.[8] To do so, the

---

[6] The majority chastises me for a failure to identify the specific extrinsic force that broke the chain of proximate causation in this case. Yet it is not necessary to do so because, by the terms of the statute, all we are to focus on is whether the work-related injury was the proximate cause of the death. As long as it was only a proximate cause, as the majority's own analysis of the facts seems to make clear it was, there can be no recovery under the statute. A brief review of the circumstances surrounding the death of Mr. Hagerman makes this clear. First, where the medical personnel were aware of the medications the decedent was taking, undoubtedly the admonishment to drink unlimited amounts of water was a proximate cause of the death because it was Mr. Hagerman's following of this advice, coupled with the effects of the diuretic, that precipitated his seizure. Additionally, where Mr. Hagerman spent a significant amount of time in the hospital after his initial seizure, and the record suggests some of the treatments caused further injury, the medical provider's negligence or inattention should be considered a proximate cause of the death. Moreover, it seems rather plain that the decision to remove life support must be viewed as a proximate cause of Mr. Hagerman's death. There are probably other factors that were proximate, of course, but certainly the point is clear. There was not a single proximate cause of this death. To be noted, I do not contend that these forces were superseding intervening causes, which is indeed the fundamental confusion the majority labors under in its analysis; rather, they were only additional proximate causes. Consequently, I believe that, in light of the evidence in the record, the plaintiff failed to demonstrate that the work-related injury was "the proximate cause" of Mr. Hagerman's death as required by the statute.

[7] Because the statute requires that the work-related injury be "the proximate cause" of the nonimmediate death before benefits are properly granted under § 375(2), and such is not the case here, I need not, and hence do not, address whether the work-related injury was "a" proximate cause of Mr. Hagerman's death as discussed by the Court of Appeals.

[8] While the majority begins its analysis by citing the definitions of "a" and "the" that appear in Black's Law Dictionary (5th ed), it is preferable to use a lay dictionary when defining common words or phrases that have not acquired a unique meaning at law because "the common and approved usage of a nonlegal term is most likely to be found in a standard diction-

majority defines proximate cause as the "primary or moving" force, noting that the term therefore contains within it recognition that there can be other forces that contribute to an injury. *Ante*, p 729. This is clearly correct in the sense that, as anyone would recognize, many forces, as causes in fact, contribute to an event. Moreover, as the majority takes great pains to explain, our jurisprudence recognizes generally that there may be more than one proximate cause of a single injury. Yet the inevitability of multiple causes in fact and the possibility of the existence of multiple proximate causes does not negate that there may be only one proximate cause in a given case.

Contrary to the assertion of the majority, nothing in the term "proximate cause" itself forecloses the limiting effect of the word "the." Recognition that a proximate cause may be one of many only reinforces the notion that we must apply the commonly understood distinction between "the proximate cause," meaning the sole proximate cause, and "a proximate cause," meaning one of potentially many. The majority's assertion that the text of subsection 375(2) does not itself articulate a requirement of sole proximate cause demonstrates a fundamental unwillingness to apply the plain meaning of the text as written by the Legislature. Contrary to the majority's strained analysis, this case is really not complex and simply requires us to adhere to the fundamental judicial discipline to comply with the Legislature's decisions as reflected in

---

ary and not a legal dictionary." *Horace v City of Pontiac*, 456 Mich 744, 756; 575 NW2d 762 (1998).

the statutes it enacts, regardless of whether it is the decision we would have wished it to make.[9]

Yet, by replacing what the Legislature actually said by unwarrantedly creating a hybrid definition of "the proximate cause" previously unknown, the majority runs afoul of the concept and purpose of law itself, which is to enable our citizens, and those who advise them, to know prospectively what the law is and thus to be able to conform their conduct to what it requires. For a court to refuse to give the words of a statute their accepted meaning makes the law unpredictable and moves in the direction of a system with merely a conglomeration of rules and rulings, changeable arbitrarily and without notice, which is the antithesis of law. This is of great importance, and the precedent the majority establishes will undoubtedly be seen by this Court again as litigants in later cases utilize this holding to argue for the rewriting of other statutes on little other basis than, as here, that the change is advisable.

I further disagree with the majority because the cases it cites do not support its result. Contrary to the majority's reading, these cases suggest that a work-

---

[9] Although referring to a different statute than the one at issue in this case, this Court has previously recognized that the mere fact that a statute makes benefits more difficult to obtain is no reason to refuse to apply the statute as written.

"The statute, as it is written, may not afford the plaintiff what some would regard as adequate relief, or *may render that relief more difficult to obtain. . . .* While we may be sympathetic to the plaintiff's predicament, we are reminded that '[i]t is not within the province of this Court to read [into a statute] a mandate that the legislature has not seen fit to incorporate. Our duty is to apply the law as we find it.' " [*Piper v Pettibone Corp*, 450 Mich 565, 572; 542 NW2d 269 (1995) (emphasis added), quoting *Carter v Detroit Harbor Terminals, Inc*, 414 Mich 498, 505; 327 NW2d 257 (1982).]

related injury may be deemed to be the proximate cause of an employee's subsequent death if the plaintiff shows the injury was a substantial factor in the death and the evidence does not raise a genuine issue regarding whether some other cause was a proximate cause of the death. Several cases cited by the majority simply address whether the work-related injury satisfied the causation standard applicable for injury/nonimmediate death cases.[10] In others, the issue presented was whether the evidence was sufficient to find that the injury was a proximate cause of the death.[11] Two cases cited by the majority concern nonimmediate death, and contain some language regarding sole causation. See *Monk v Charcoal Iron Co of America*, 246 Mich 193; 224 NW 354 (1929), and *Neumeier v City of Menominee*, 293 Mich 646; 292 NW 511 (1940). However, a close examination of these cases demonstrates they are not dispositive in this case.

*Monk* relied on case law inapplicable to the question presented in this case, citing *La Veck v Parke, Davis & Co*, 190 Mich 604; 157 NW 72 (1916), and *Schroetke v Jackson-Church Co*, 193 Mich 616; 160 NW 383 (1916), and made statements referencing "sole, proximate" causation without the analysis of the key distinction between the differing standards that must be met, depending on whether there was an injury/immediate death or nonimmediate death. Addi-

---

[10] *Oleszek v Ford Motor Co*, 217 Mich 318; 186 NW 719 (1922); *La Veck v Parke, Davis & Co*, 190 Mich 604; 157 NW 72 (1916); *Schroetke v Jackson-Church Co*, 193 Mich 616; 160 NW 383 (1916).

[11] *Swanson v Oliver Iron Mining Co*, 266 Mich 121; 253 NW 239 (1934); *Waite v Fisher Body Corp*, 225 Mich 161; 196 NW 189 (1923); *Anderson v Fisher Body Corp*, 239 Mich 506; 214 NW 938 (1927); *Seifman v Ford Motor Co*, 282 Mich 342; 276 NW 472 (1937).

tionally, reading this Court's opinion in *Neumeier*, *supra*, in context, one understands that the Court did not have before it evidence that some extrinsic force was a proximate cause of the death. Under such facts the Court simply relied on prior case law that had been decided on the basis that the evidence presented was sufficient to show that the work-related injury was a proximate cause of the injury.

However, more relevant to this case is the decision in *Byrne v Clark Equipment Co*, 302 Mich 167; 4 NW2d 509 (1942), which supports the conclusion that the failure to attribute sole proximate causation to the workplace injury cuts off the employer's liability in cases of nonimmediate death. In *Byrne*, the decedent suffered a hernia at work, and, during the resulting surgery, the physician also removed the decedent's appendix. After the operation, the decedent contracted an infection and died. This Court concluded that, under these facts, the claimant had failed to establish that the work-related injury was the proximate cause of the death.

Notably, the Court's analysis demonstrates that a "but for" causal link (i.e., but for the injury the surgery would not have been performed and defendant exposed to the risk of surgery) is insufficient to establish compensability under subsection 375(2). Thus, the majority's adoption of a "but for" analysis, "aggravating medical consequences will not break the chain of causation where the injury necessitates foreseeable medical treatment and there is an evidentiary foundation that supports the conclusion that there was a clear and unbroken chain of events leading to death," *ante*, p 748, is inconsistent with both the lan-

guage of the statute and prior precedent of this Court.[12]

Finally, I believe it is necessary to address the majority's apparent extension of the holding in *Dedes v Asch*, 446 Mich 99; 521 NW2d 488 (1994). The four-justice majority in *Dedes* held that, in pursuing a claim under the governmental immunity statute,[13] the plaintiff need not show that the defendant's negligence was "the" sole proximate cause of the injury (but could be "a" proximate cause), despite the statutory requirement that the negligence be "the proximate cause" of the injury. This holding, turning as it did on the definition of "the," was clearly wrong in the definition it gave. As I have previously explained, "the" does not have the same meaning as "a."

Despite this, the *Dedes* majority read "the" to mean "a." In doing so, *Dedes* focused on the legislative history of the governmental immunity statute, which was silent on this issue, and concluded, entirely without any reason to do so other than that the members of the majority would not have done this if they had been in the Legislature, that the Legislature would not have made a major change in the law without com-

---

[12] In this regard I also note that our courts have admonished that " '[t]he compensation law is to be construed liberally to provide indemnity for accidents peculiarly incidental to employment, but it was not intended to be health, accident and old age insurance and spread general protection over risks common to all . . . .' " *Adkins v Rives Plating Corp*, 338 Mich 265, 271; 61 NW2d 117 (1953); *Schaefer v Williamston Community Schools*, 117 Mich App 26; 323 NW2d 577 (1982). Yet in finding that the work-related injury was the proximate cause of Mr. Hagerman's death, the majority has construed the worker's compensation statute to effectively provide life insurance in this case.

[13] MCL 691.1407(2); MSA 3.996(107)(2).

menting on it in the history, such as it is, of the legislation.[14]

In any case, whatever one thinks about the use of legislative committee reports, I believe this whole approach of the *Dedes* majority runs contrary to the organizing, and rather obvious, principle that the stat-

---

[14] It has been said before, but it bears repeating.

Legislative histories are always suspicious. As Mr. Justice Scalia said, in reference to the United States Congress:

"My general attitude towards [legislative history] can be summed up . . . by saying that I regard it as the greatest surviving legal fiction. If you can believe that a committee report (to take the most respected form of legislative history) in fact expresses what all the Members of Congress (or at least a majority of them) 'intended' on the obscure issues that it addresses; if you can believe that a majority of them even read the committee report; indeed, if you can believe that a majority of them was even aware of the existence of the obscure issue; then you would have had no trouble, several hundred years ago, in permitting all tort actions to be squeezed into the writ of assumpsit by the patently phony allegation that the defendant had undertaken (assumpsit) to be careful. Even beyond the unreliability of almost all legislative history (most of which is now cooked-up legislative history) as an indication of intent, it seems to me that asking what the legislators intended rather than what they enacted is quite the wrong question. [Address by Justice Antonin Scalia before the Attorney General's Conference on Economic Liberties in Washington, D.C. (June 14, 1986).]"

Compounding the problem with the Michigan legislative histories is that, in this state, unlike the federal legislature, there is no verbatim journal of the proceedings of either house of the Legislature or of its committees. Further, unlike Congress, the Michigan House of Representatives or Senate does not vote on an acceptance of the legislative history. The creation of legislative histories are therefore free play for legislative staffers and special-interest pleaders. Their hope may well be to fill these empty vessels with potions on the chance that someday some credulous court, unaware of its dubious authenticity, may drink deeply. [*Marposs Corp v City of Troy,* 204 Mich App 156, 167-168, n 2; 514 NW2d 202 (1994) (TAYLOR, P.J., dissenting), majority opinion overruled by super majority panel in *Safety Restraint Group v City of Troy,* 215 Mich App 289; 544 NW2d 481 (1996).]

ute, not its history, is what is law. The history, or its lack, cannot surmount what the Legislature has actually said. After all, as Justice Scalia has trenchantly observed, "we are a Government of laws, not of committee reports." *Wisconsin Public Intervenor v Mortier*, 501 US 597, 621; 111 S Ct 2476; 115 L Ed 2d 532 (1991) (Scalia, J., concurring).

This much must be said for the majority in *Dedes*, however: unlike the majority in this case, it at least limited its holding by invoking the lack of legislative history as a reason for overruling the Legislature's choice. Indeed, the instant majority opinion unblushingly creates the new rule that "the" may mean "a," even where neither the language of the statute nor its legislative history supports such a reading.[15] This was necessary of course because under *Dedes*, flawed as it is, the limiting rationale would not have allowed the majority to do what it wants to do here.

Under the *Dedes* rationale, this Court refused to give effect to the word "the" before proximate cause because it would have been a major change in the law of comparative negligence existing at the time the statute at issue in *Dedes* was enacted and no surrounding legislative history gave sufficient indication that the Legislature knew that this was what it was

---

[15] Although the majority has attempted to limit its holding to instances where the words "the" or "a" precede "proximate cause," this begs the question—"Why?" In both this case and *Dedes*, the analytical problem is why the Legislature should be taken as not understanding the use of these words when they precede proximate cause, but somehow understanding them when they precede other words or phrases. It is indeed the unanswerable nature of this conundrum that makes any effort by the majority to limit this unfortunate holding futile. It should not be doubted that this holding, which has no discernible principled limitations, will be used in the future by zealous advocates to encourage this Court to engage in yet other forays into statutory revision.

doing. This cannot be said about the predecessor of subsection 375(2) when it was enacted in 1912.

As previously discussed, the common-law rules regarding multiple proximate causation were well established in 1912. Apart from the removal of consideration of negligence attributable to the employee or a coemployee, the Legislature's decision to limit an employer's liability for worker's compensation benefits in instances where other causes could be attributed to the employee's subsequent death was in accord with the negligence doctrines that pertained throughout the tort law of that day. Therefore, under the *Dedes* rationale, we would have been constrained to give it the meaning that was well understood in 1912. Because this result is unpalatable to the majority, *Dedes* and its limiting rationale is given only passing mention.[16]

Second, and more important to our jurisprudence generally, the majority, having ventured onto the slippery slope of judicial legislation in *Dedes*, is now tumbling down it, having created the new rule that "a" and "the," as used in a statute, are apparently always interchangeable at the will of this Court.[17] Such a broad claim of power in the courts to rewrite clear

---

[16] In this regard I agree with the sentiments expressed by Judge BANDSTRA in his concurrence in this case. See *Hagerman v Gencorp Automotive (On Remand)*, 218 Mich App 19, 25; 553 NW2d 623 (1996). In light of the fact that *Dedes* remains on the books, I would effectively "cabin" its holding to cases where only a showing could be made of a major deviation in the legislation from previously existing law without noting understanding, by way of history, that the Legislature knew such a deviation was being undertaken. Because that cannot be shown here, I would not apply *Dedes* to this case.

[17] Indeed, one must wonder when we will begin to see efforts at the deconstruction of other words and phrases? Certainly litigants will press the issue on us all the more so because we have established no meaningful limits on when this previously unknown power will be exercised.

statutes blatantly defies the, until now, well understood concept of constitutional separation of powers. As the Michigan Constitution states, "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2.[18] Yet this Court has now given notice that if you can convince us that we should rewrite what the Legislature said we will do it. We have no such authority under the constitution.

This Court has in the past repeatedly noted that it is not within its province to consider or determine the wisdom, policy, or equity of a legislative enactment, absent finding some constitutional violation. *Highland Park v Oakland Co Drain Comm'r*, 312 Mich 407; 20 NW2d 253 (1945); *Warren Twp v Engelbrecht*, 251 Mich 608; 232 NW 346 (1930). It should not need repeating, but the most respected authorities in our jurisprudence say no less. United States Supreme Court Chief Justice John Marshall, among the most influential figures in the development of American law, explained in *Gibbons v Ogden*, 22 US (9 Wheat) 1, 197; 6 L Ed 23 (1824), that our form of government rests such decisions with the Legislature, which is accountable to its constituents, not the courts, regarding decisions of policy.

> The wisdom and the discretion of [the legislature, its] identity with the people, and the influence which [legisla-

---

[18] The United States Constitution similarly separates the powers of the legislature, executive, and judiciary. US Const, art I, § 1; art II, § 1, and art III, § 1.

tors'] constituents possess at elections, are, in this, as in
many other instances, as that, for example, of declaring
war, the sole restraints on which they have relied, to secure
them from its abuse. They are the restraints on which the
people must often rely solely, in all representative
governments.

Additionally, it was noted by Michigan's most
renowned jurist, Justice THOMAS A. COOLEY, in his
work entitled A Treatise on the Constitutional Limita-
tions (8th ed), vol 1, pp 345-346, that

except where the Constitution has imposed limits upon the
legislative power, it must be considered as practically abso-
lute, whether it operate according to natural justice or not
in any particular case. The courts are not the guardians of
the rights of the people of the State, except as those rights
are secured by some constitutional provision which comes
within the judicial cognizance. The protection against
unwise or oppressive legislation, within constitutional
bounds, is by an appeal to the justice and patriotism of the
representatives of the people. If this fail, the people in their
sovereign capacity can correct the evil; but courts cannot
assume their rights. The judiciary can only arrest the execu-
tion of a statute when it conflicts with the Constitution. It
cannot run a race of opinions upon points of right, reason,
and expediency with the law-making power . . . .

Yet, the majority departs from this standard by adopt-
ing the rule it embraces today. This Court, with no
authority I understand, has given itself the power to
disregard the clear expressions and decisions of the
Legislature. There will be, I fear, much harm to come
from this unwarranted assertion of power.

It further should be pointed out that, although the
words of our constitution and the United States Con-
stitution clearly make such judicial interference with

the words of the Legislature impermissible, it is also the case that such a role for the judiciary was even considered, and rejected, by the framers of the federal constitution, which, of course, is the model for our Michigan Constitution. When the Constitutional Convention opened in Philadelphia in May 1787, the Virginia Plan was the first proposal formally submitted to the convention. This plan had at its heart a proposal that all acts of the legislature would be subject to a veto power vested in a council of revision composed of the executive and members of the judiciary. Despite the persistent efforts of James Madison and James Wilson to convince the delegates to invest the judiciary with such power to oversee the acts of the legislature, on no less than four separate occasions (June 4 and 6, July 21, and August 15, 1787), the framers specifically rejected the proposal that the judiciary be given such power.[19]

Now, all these years later, this Court, with no authority I can discern, has determined that it is free, if it seems advisable to do so, to disregard the expressed will of the Legislature. I disagree with the majority's willingness to impose its own notions of proper public policy when the Legislature has indicated, through the words of the statute, its collective decision to the contrary on the issue. The majority

---

[19] As noted by Georgetown University Professor Walter Berns, James Madison and others "would have given the judiciary an openly political role under the Constitution." Berns, *Taking the Constitution Seriously* (Lanham, Maryland: Madison Books, 1987), p 201. In his book, from which my discussion of the Constitutional Convention is drawn, Professor Berns discusses the explicit rejection of this proposal, noted above, citing the specific proposals and votes cited in Farrand, *The Records of the Federal Convention of 1787* (New Haven: Yale University Press, 1966).

trods today where our predecessors have prudently declined to go.

BRICKLEY and WEAVER, JJ., concurred with TAYLOR, J.