CIMOCK v CONKLIN

BEILFUSS v CONKLIN

KARAUS v CONKLIN

McMAHON v ALLEGAN COUNTY BOARD OF COUNTY ROAD
COMMISSIONERS

Docket Nos. 197763, 197766, 197879, 200762. Submitted June 2, 1998, at
    Grand Rapids. Decided December 4, 1998, at 9:15 A.M. Leave to
    appeal sought.

    Mark and Deborah L. Cimock, Vernon J. Beilfuss, and Donald G.
    Karaus, Jr., and Ann D. Parikh (collectively, the purchasers),
    brought separate actions in the Allegan Circuit Court against Frank
    T. and Sharon K. Conklin, George L. and Kathleen M. McMahon,
    and Geraldine R. Statler as trustee of the Statler Trust (collectively,
    the sellers) and others, alleging that each of the parcels of land that
    the respective purchasers had purchased from the sellers had been
    purchased in the belief that the easement for public road purposes
    that ran along the north side of the quarter-section line that was
    the southern boundary of the development in which the parcels
    were located was one rod in width east of the section center post,
    that the public road easement did not extend to the west of the
    section center post, and that they and other back-lot owners would
    share a private lake-access easement along the north side of the
    quarter-section line from the section center post to the shore of
    Lake Michigan, but that the Allegan County Board of County Road
    Commissioners claimed an easement for road purposes that was
    two rods in width and that extended along the quarter-section line
    all the way to Lake Michigan. The purchasers sought damages on
    the basis that the sellers had negligently misrepresented both the
    width and length of the easement and that the values of their par-
    cels were diminished as a result of the easement claimed by the
    county board. About the same time, George L. McMahon and Frank
    T. Conklin brought an action in the Allegan Circuit Court against
    the Allegan County Board of County Road Commissioners and
    others, seeking to quiet title and alleging that the road easement
    enforceable against the lands in question was one rod in width to
    the east of the section center post and did not extend to the west
    of the section center post. Because the various actions had a com-

mon factual basis, the matters were jointly tried. The court, Harry A. Beach, J., held, on the basis of its finding that the elements of highway by user had been established, that the county board had an easement two rods in width along the north side of the quarter-section line east of the section center post and had a two-rod easement along the north side of the quarter- section line that extended about 477 feet west of the section center post, but that the easement did not extend to the shore of Lake Michigan. Following further proofs, the court found in favor of the purchasers in their actions for damages from the sellers. The sellers appealed separately each of the three judgments for damages and the judgment determining the width and extent of the easement for road purposes. The appeals were consolidated.

The Court of Appeals *held*:

1. A trial court's determination concerning whether the legal requirements of a highway by user have been established is reviewed de novo, with the trial court's findings of fact being reviewed for clear error.

2. The highway-by-user statute, MCL 221.20; MSA 9.21, provides that a road that has been used as such for ten years or more shall be deemed to be a public highway and that such a highway is presumed to have a width of two rods on either side of the centerline of the highway. A showing of a highway by user requires evidence of a line of travel with definite boundaries that has been used and worked on by public authorities and that has been traveled on by the public for ten consecutive years in an open, notorious, and exclusive manner. The element of travel by the public contemplates use of the roadway as a road by individual members of the general public and is not satisfied by the use or maintenance of the roadway by employees of a government entity.

3. There was substantial evidence supporting the trial court's finding that the county board had performed maintenance work on the disputed roadway for more than ten years. However, the trial court clearly erred in finding that the disputed roadway had been used as a highway by the general public in an open, notorious, and exclusive manner for a period of ten or more consecutive years. The evidence concerning the use of the disputed roadway by the public suggests that the uses that were testified to were permissive in nature, and, in any event, it would appear that the period of the claimed public use of the disputed roadway did not coincide with the period of the governmental maintenance of the disputed roadway. Accordingly, the trial court erred in finding that the county board had established that it was entitled to claim the disputed

roadway as a public highway under the provisions of the highway-by-user statute.

4. Because the actions for damages brought by the purchasers were predicated on the claim by the county board of a right to an easement for highway purposes of two rods in width along the north side of the quarter-section line, and because the evidence failed to support the county board's claim to the disputed easement, the trial court's awards of damages in favor of the purchasers must be vacated.

Judgment in Docket No. 200762 reversed; judgments in Docket Nos. 197763, 197766, and 197879 vacated.

HIGHWAYS — HIGHWAY BY USER — EVIDENCE — PUBLIC TRAVEL.

A line of travel that has definite boundaries, that has been used and worked on by public authorities, and that has been traveled on by the public for ten consecutive years in an open, notorious, and exclusive manner is, by statute, deemed to be a public highway; travel by the public contemplates use of the roadway as a road by individual members of the general public and is not satisfied by the use or maintenance of the roadway by employees of a government entity (MCL 221.20; MSA 9.21).

*Coupe & Van Allsburg, P.C.* (by *William W. Coupe*), for Mark and Deborah L. Cimock, Bernon J. Beilfuss, Donald G. Karaus, Jr., and Ann D. Parikh.

*John A. Watts, P.C.* (by *John A. Watts*), for Frank T. and Sharon K. Conklin, George L. and Kathleen M. McMahon, and Geraldine R. Statler as trustee of the Statler Trust.

*Orton, Tooman, Hale, McKown & Kiel, P.C.* (by *Stephen B. McKown*), for Allegan County Board of County Road Commissioners.

Before: MACKENZIE, P.J., and WHITBECK and G. S. ALLEN*, JJ.

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

WHITBECK, J. In Docket No. 200762, George and Kathleen McMahon, Frank and Sharon Conklin, and Geraldine Statler, as trustee of the Statler Trust, (collectively, the sellers) appeal of right the decision of the trial court recognizing an easement for public road purposes in favor of the Allegan County Board of County Road Commissioners (ACBCRC). In Docket Nos. 197763, 197766, and 197879, the sellers appeal from the trial court's award of damages to parties to whom the sellers sold property that the trial court concluded was subject to the easement. The trial court predicated its damage awards on its finding that the sellers were liable under a theory of negligent misrepresentation in connection with their apparent failure to inform the purchasing parties of the claim of the ACBCRC. We reverse the trial court's decision recognizing a highway by user in favor of the ACBCRC and, accordingly, vacate the damage awards predicated on the recognition of the highway by user. We therefore remand to the trial court for any necessary further proceedings consistent with this opinion.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The multiple and intertwined claims in this case have their genesis in the ACBCRC's claim to a public right of way over a portion of land in Ganges Township that included a roadway or pathway that continued in almost a straight line from the end of 117th Avenue to the shore of Lake Michigan and abutted property once owned by the sellers.[1] The ACBCRC presented evidence (the ACBCRC evidence) that its

---

[1] We do not attempt to provide a comprehensive summary of the facts underlying this factually cumbersome case. Rather, we focus on the critical facts important to our decision.

employees performed snow plowing and other maintenance work on part of this section of land for many years. The ACBCRC also presented testimony from Wilma Forry (the Forry evidence) that she and her brother had used this roadway or pathway. Testimony from George McMahon tended to indicate that, for a time, the ACBCRC used part of the roadway or pathway to turn around their vehicles with permission from him to facilitate the ACBCRC's work in snow plowing 117th Avenue, which is undisputedly a public road.

The trial in this case lasted six days and was essentially divided into three phases. The first two days dealt with the validity of the ACBCRC's claimed right of way based on a highway by user. At the conclusion of the second day, the trial court, in essence, announced its decision that it would recognize a right of way based on a highway by user in favor of the ACBCRC, but not to the full extent claimed by the ACBCRC. The remaining days of the trial were devoted to other issues and, in light of our analysis and decision, do not warrant extended discussion.

The trial court eventually issued a written opinion holding that the ACBCRC had an easement under the highway- by-user doctrine that was thirty-three-feet wide on each side of the quarter-section line (that is a total of sixty-six feet or four rods) and that extended to a point referred to as the "turn around area" that was ten feet beyond the stump of a once large beech tree and that was about 477 feet west of the section center post, which was located at the west end of the improved portion of 117th Avenue. The trial court expressly rejected the ACBCRC's contention that its easement extended to the shore of Lake Michigan, stating that there was no testimony of any use by the

public or the ACBCRC of the road at any point west of the "turn around area". Because the ACBCRC has not filed a cross appeal, all that is at issue at this point in the dispute between the sellers and the ACBCRC is whether the ACBCRC should be recognized as having a highway by user to the extent recognized by the trial court. In the remainder of this opinion, we will refer to the portion of the roadway or pathway that the trial court concluded to be included within a highway by user as the "disputed roadway."

## II. STANDARD OF REVIEW

As with questions of law generally, we review the legal requirements for establishing a highway by user de novo. See, e.g. *Hagerman v Gencorp Automotive*, 457 Mich 720, 727; 579 NW2d 347 (1998). However, we review the trial court's factual findings for clear error. *Kent Co Rd Comm v Hunting*, 170 Mich App 222, 232-233; 428 NW2d 353 (1988). A finding is clearly erroneous if "the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id.* at 233.

### III. THE ACBCRC's CLAIM TO A HIGHWAY BY USER

#### A. THE TRIAL COURT's FINDING

The sellers argue that the trial court erred in finding a highway by user with regard to the disputed roadway. In part, the sellers argue that there was no use of the disputed roadway by the public. We agree that the trial court clearly erred in finding that there was the requisite public use to support the existence of a highway by user.

The trial court stated in its written opinion regarding the ACBCRC's claim of a highway by user:

Testimony was presented at trial from Dennis Herbert, Stanley Goshorn and Charles Flanner, all heavy equipment operators for the [ACBCRC], indicating that the county graded and maintained the roadway in question west to a turn around area that existed approximately 10 feet beyond a large beach [sic, beech] tree east of the bluff overlooking Lake Michigan. Stanley Goshorn testified that the turn around area referred to above was in existence at least by the mid-1970's. Charles Flanner indicated that the turn around area was in existence in 1969, when he began maintaining the area for the [ACBCRC]. Another witness, Wilma Forry, testified that she lived near the roadway in question from 1934 through 1952, and that the roadway and turn around area was in existence in the 1940's. She also testified that she came back to the area in the late 1950's or early 1960's, and actually used the roadway in question to gain access to Lake Michigan.

*     *     *

The [ACBCRC] presented testimony at trial from County employees and other witnesses indicating that the roadway in question was in existence and maintained by the [ACBCRC] for more than 10 years. Based on this testimony and other evidence presented at trial, including a county Atlas dated 1880, it is the Opinion of this Court that a highway by user was established along the county section [sic, quarter-section] line of section 19, running West to a point 10 feet west of the beach [sic] tree east of the bluff overlooking Lake Michigan.

*     *     *

There was no evidence presented that the landowners['] use of the property was in anyway inconsistent with the [ACBCRC] right of way, therefore, the statutory presumption that the right of way to the north of the section line is 33 feet wide is applicable. MCLA 221.20 [MSA 9.21]. The public right of way covers the south 33 feet of the NW frl.1/4 of section 19 for the length of the above described roadway.

The roadway in question does not extend to the shores of Lake Michigan, as claimed by the [ACBCRC]. There was no

testimony as to any use by the public or the [ACBCRC] beyond the turn around area 10 feet to the west of the identified beach [sic] tree.

### B. THE STATE HIGHWAY-BY-USER STATUTE

### 1. THE STATUTORY LANGUAGE

MCL 221.20; MSA 9.21, the highway-by-user statute, provides:

> All highways regularly established in pursuance of existing laws, all roads that shall have been used as such for 10 years or more, whether any record or other proof exists that they were ever established as highways or not, and all roads which have been or which may hereafter be laid out and not recorded, and which shall have been used 8 years or more, shall be deemed public highways, subject to be altered or discontinued according to the provisions of this act. All highways that are or that may become such by time and use, shall be 4 rods in width, and where they are situated on section or quarter section lines, such lines shall be the center of such roads, and the land belonging to such roads shall be 2 rods in width on each side of such lines.

### 2. THE ELEMENTS OF HIGHWAY BY USER

The highway-by-user statute treats property subject to it as "impliedly dedicated to the state for public use." *Kentwood v Sommerdyke Estate*, 458 Mich 642, 652; 581 NW2d 670 (1998). "'Highway by user' is a term that is used to describe how the public may acquire title to a highway by a sort of prescription where no formal dedication has ever been made." *Hunting, supra* at 230. A showing of the existence of a highway by user requires " 'evidence of a defined line of travel with definite boundaries, used and worked upon by public authorities, traveled upon by the public for ten consecutive years without interrup-

tion, in an open, notorious and exclusive manner.' " *Kentwood, supra* at 666, quoting *Hunting, supra* at 231.[2]

It is readily apparent, and we hereby hold, that the highway-by-user statute articulates maintenance by a public authority and use by the public as two separate and distinct elements of a valid claim of highway by user, *Kentwood, supra* at 666. We conclude that the latter element requires evidence of use of the roadway claimed to be a highway by user by members of the *general* public, not merely by employees of a governmental entity, on a repeated basis for the requisite ten-year period.[3] Further, in our judgment a plain understanding of the requirement of a roadway that has been " 'traveled upon by the public for ten consecutive years,' " *id.*, would require extensive use of the roadway by individual members of the public for their varied purposes, not merely use by a governmental entity such as the ACBCRC. In our view, this understanding also comports with the plain language of the pertinent part of the highway-by-user statute, MCL 221.20; MSA 9.21, in requiring that a road must have been used *as a highway* for ten years to

---

[2] Because the burden of showing a highway by user is on the governmental entity claiming the highway by user, it is somewhat peculiar that the sellers presented their witnesses before the trial court before the ACBCRC doing so. However, neither the sellers nor the ACBCRC have raised a claim of error based on the manner of presentation of proofs at trial. Further, there appears little reason for concern that the order of presentation of proofs affected the outcome below or is important to our review.

[3] Of course, this does not require constant or continuous use by the general public over the course of a ten-year period. An apt analogy is the requisite continuous and exclusive use for establishment of an adverse possession claim. See *Denison v Deam*, 8 Mich App 439, 442-444; 154 NW2d 587 (1967) (use of land for summer living purposes and recreational activities can support a claim of adverse possession where such use is consistent with the character of the property).

become a highway by user. A common understanding of the term "highway," it seems to us, includes use of a stretch of road by the *public at large*. In the case at hand, we conclude that, while there was substantial evidence to support the trial court's finding that the ACBCRC had performed maintenance work on the disputed roadway for more than ten years, the trial court clearly erred, *Hunting, supra* at 232-233, by finding that roadway was "publicly used" for purposes of the highway-by-user statute for more than ten years.

### C. THE ACBCRC EVIDENCE

Dennis Herbert testified that he had been a heavy equipment operator with the ACBCRC for twenty-two years. While the testimony is somewhat unclear, Herbert apparently indicated that he had used a "power grader" to grade the disputed roadway and had snowplowed it and that he first used the grader around 1989. Apparently from Herbert's testimony, he used a power grader on the disputed roadway three times until "a lady c[a]me out and let me know very clearly that it was supposed to be private and [he] was not supposed to be in there." Herbert indicated that, with regard to performing work with vehicles for the ACBCRC on 117th Avenue and the disputed roadway, he "would go up to the turn around" where he would circle around a tree and turn around. According to Herbert's testimony, the ACBCRC at times plowed snow up to the point of the tree that was located at the "turn around."

Stanley Goshorn testified that he had been a road worker with the ACBCRC since April 1966. Goshorn said that he "did both snow plowing and road maintenance" on 117th Avenue between 1976 and 1980. He

further testified that he believed he "graded the road" along 117th Avenue after that time. Goshorn indicated that, in his work for the ACBCRC, he had traveled down the disputed roadway to the same point where Herbert had traveled:

> I went down beyond South Lane to where that tree turn around was at that Mr. Herbert described [sic] and did the same thing with the truck as he did. We usually made a bend to the right as far as we could go before we went into Mr. Darling's garage and then we'd back up and continue on around and come back east out to the same way we went in.

Goshorn indicated that he left the blade of his vehicle down, that is that he performed work with the blade on the disputed roadway, until he reached the turn around.

Charles Flanner testified the he had been employed by the ACBCRC for close to twenty-seven years and had been a heavy equipment operator for the ACBCRC for "[p]robably" fifteen years. Flanner testified that he performed maintenance on 117th Avenue from roughly 1969 to 1976. When asked what he did on the road, Flanner replied, "In the summer it was just routine maintenance and in the winter why, I plowed snow." Flanner further explained that he probably only did blading in the summer until about 1973, indicating his belief that someone else plowed it in the winter at that time. However, he believed that he plowed the road from 1973 to 1976. Flanner indicated that he performed grading work "clear to the turn around." Flanner testified that the extent of his maintenance work at the turn around was to try to "smooth it up a little bit" if it got rough. He indicated that he recalled that he plowed the disputed roadway

in the same manner that Goshorn described having plowed it. He further indicated that, when he plowed or graded 117th Avenue, he always went down to the end of the disputed roadway. Flanner testified that he probably went down the disputed roadway hundreds of times during the course of a winter.

We note that, when asked whether from his "experience," the ACBCRC had done any maintenance "as to the roadway . . . west of North [Lane] and South Lane," George McMahon replied:

> Not to my knowledge. The only thing that I know they would have done is some snowplowing if they—when they were turning the truck around if they kept the plow down. I believe that they did that sometimes and turned around down there.

Later, when asked about the ACBCRC's actions with regard to the roadway at issue, George said:

> They may have graded it. Like I say, they turned their trucks around down there and it's a question of whether they had the plow or the grader blade down.

George McMahon indicated that he understood that the ACBCRC traveled down the disputed roadway simply to turn around. Nevertheless, in light of the testimony from the three ACBCRC workers about their work on the disputed roadway, we conclude that the trial court did not clearly err, *Hunting, supra* at 232-233, in finding that the ACBCRC performed maintenance work on the roadway for more than ten years. Considered together, the testimony of Herbert, Goshorn, and Flanner well supported the trial court's finding that the ACBCRC had performed maintenance work on the disputed roadway for more than ten years. How-

ever, viewing the pertinent testimony most favorably to the ACBCRC, the testimony of these three witnesses only showed maintenance work by the ACBCRC beginning in 1969.

As set forth above, the performance of maintenance work by a public authority is a necessary, *but not a sufficient,* condition for the finding of a highway by user. Showing the existence of a highway by user also requires showing that the pertinent roadway was traveled upon by the general public for a period of at least ten years.

### D. THE FORRY EVIDENCE

The trial court appears to have placed critical reliance on the testimony of Wilma Forry in concluding that there was a ten-year period of public use of the disputed roadway. Forry testified that she was sixty-one years old and that she was familiar with 117th Avenue because she had lived at the farmhouse where she was born on the corner of 117th Avenue and 70th Avenue from 1934 to 1952. This is east of the disputed roadway, along two roadways that are undisputedly public. She also indicated that she bought property from her mother near the pertinent area in 1968. Forry indicated that she remembered the pathway that included the disputed roadway from the early years when she lived on the corner of 117th Avenue and 70th Avenue, going back to "[p]robably at least when [she] was around 8 years old, at least that far." She basically described the disputed roadway as looking "like a two track for two tires, one width of a car." Forry indicated that she and her brothers had

used the disputed roadway during her childhood from 1934 to 1952:[4]

> At the end was a very large beech tree, which we would drive around, usually to the right, and turn around to the left. We'd park down there and we would sometimes use the partial stairs, but that was in the early years.

Although the testimony elicited from Forry on this point is somewhat unclear, she apparently indicated that she went down the disputed roadway after 1954 when she came home from college to visit and thereafter when she was in her twenties and thirties.

However, this testimony about use of the disputed roadway by Forry concerns a period well before 1969, the earliest date that the testimony of the ACBCRC employees establishes the ACBCRC as having performed work on the disputed roadway. Thus, Forry's testimony does little, if anything, to show maintenance of the disputed roadway contemporaneously with the time that she and her brothers used it. We note that Forry did testify that she remembered 117th Avenue being maintained by the ACBCRC. However, she did not remember how far west those maintaining 117th Avenue went in their maintenance work. Thus, Forry's testimony provides no significant indication of whether the ACBCRC (or any other public authority) maintained the disputed roadway during the time of her childhood.

Even more importantly, considered as a whole, Forry's testimony simply does not establish any period of use of the disputed roadway *by the general*

---

[4] In light of Forry's age and testimony about the extent of her recollection of 117th Avenue, it appears that her personal recollection of this use would only extend back to the early 1940s.

*public.* Forry indicated that most of the time she traveled the disputed roadway she was visiting friends who lived along or near it:

> Well, most of the time I visited friends down there. We knew everybody down there. So, most of the time we went on their property and visited them . . . .

This testimony strongly reflects that Forry's use of the disputed roadway was not in a manner similar to that of a member of the general public but was closely connected with people who lived along the disputed roadway and who, thus, provided her with at least implicit consent to use their private roadway. "Permissive use is not sufficient to establish a road by user." *Pearl v Torch Lake Twp,* 71 Mich App 298, 306-307; 248 NW2d 242 (1976). Moreover, Forry testified that she did not remember ever seeing anyone else driving down the disputed roadway and parking as she and her brothers had done. Similarly, when asked if the public ever used the roadway, George McMahon replied, "To my knowledge the only people that ever used that roadway were the property owners and their guests and visitors."

### E. THE FINDING OF PUBLIC USE

After a thorough review of the pertinent testimony, we conclude that the ACBCRC offered no other evidence allowing for a reasonable conclusion that the disputed roadway was regularly traveled by members of the public.[5] In light of the foregoing, we have a firm and definite conviction that the trial court made

---

[5] While the ACBCRC introduced atlases apparently showing the disputed roadway as part of a public roadway, this does very little to show that members of the general public actually made use of the disputed roadway.

a mistake by finding that the evidence presented below established that the disputed roadway was "publicly used" for more than ten years. The evidence presented below provided no basis for a conclusion that there was public use of the disputed roadway that "change[d] the character of private roads to public highways." *Missaukee Lakes Land Co v Missaukee Co Rd Comm*, 333 Mich 372, 378; 53 NW2d 297 (1952). Accordingly, the trial court clearly erred, *Hunting, supra* at 232-233, in finding a highway by user in favor of the ACBCRC in this case.

In light of our analysis, it is unnecessary to reach the other claims of error advanced by the sellers. Further, because the trial court predicated its monetary damage awards against the sellers on the existence of a highway by user in favor of the ACBCRC, it follows that those awards should be vacated.

### IV. CONCLUSION

In Docket No. 200762, we reverse the trial court's May 17, 1996, opinion recognizing a highway by user in favor of the ACBCRC and its January 10, 1997, judgment reflecting the recognition of such a highway by user. Accordingly, in Docket Nos. 197763, 197766, and 197879, we vacate the August 26, 1996, judgment and the two August 21, 1996, judgments awarding damages against the sellers, because those judgments are predicated on the existence of a highway by user in favor of the ACBCRC. We remand this case to the trial court for any necessary further proceedings consistent with this opinion. We do not retain jurisdiction.

In Docket No. 200762, the sellers, being the prevailing parties, may tax costs pursuant to MCR 7.219. No taxable costs in Docket Nos. 197763, 197766, and

197879, no party having prevailed over another in those cases.[6]

---

[6] While the sellers may be said to have "prevailed" in the sense of having the money judgments against them vacated, this was not based on the merits of the arguments in Docket Nos. 197763, 197766, and 197879 that we do not need to reach. Further, our decision favors the positions of all sides to this appeal except the ACBCRC. In these circumstances, we do not believe it would be reasonable to regard the sellers as "prevailing parties" under MCR 7.219, except with regard to the ACBCRC.